440 Mass. 625 (2004)                                                625

Fitchburg Gas and Electric Light Company v. Department of Telecommunications and Energy.

FITCHBURG GAS AND ELECTRIC LIGHT COMPANY vs.
DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY.

Suffolk. October 8, 2003. - January 8, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Department of Telecommunications and Energy. Public Utilities,* Rate structure, Rate setting. *Notice,* Rate setting. *Administrative Law,* Agency's authority, Retroactive effect of regulation. *Gas Company.*

In an appeal from an administrative decision ordering a gas company to refund the amount, with interest, that it had double billed its customers over a certain period of years, substantial evidence supported the conclusion of the Department of Telecommunications and Energy that the company had overcharged its customers by including identical inventory finance charges (charges that the company might incur when it borrowed money to purchase gas inventory) in two components of the total amount ratepayers paid for services — the base rate as well as the supplemental cost of gas adjustment clause (CGAC) — in contravention of 220 Code Mass. Regs. § 6.06 (1993) and departmental decisions, which permitted gas companies to include inventory finance charges in either their base rate or CGAC, but not both. [632-633]

The Department of Telecommunications and Energy (department) correctly concluded that a gas company illegally overcharged its customers by including inventory finance charges (IFCs) in both base rates as well as the supplemental cost of gas adjustment clause (CGAC), two elements calculated into gas customer charges, where the department's regulations standardizing a new CGAC filing did not abrogate the department's prohibition against double charging implicit in its administrative decisions, and where the department's deletion of a base rate hearing requirement merely increased the number of options a company had for recouping IFCs [633-635]; accordingly, the department did not fail to put the gas company on notice that it could not double charge its customers, in light of the considerable body of precedent proscribing the practice of double billing [635-636].

The Department of Telecommunications and Energy's (department's) repeated approval, during the relevant period, of a gas company's supplemental cost of gas adjustment clause (CGAC), which constituted one component of the total amount ratepayers paid for gas services, did not immunize the company from the consequence of having illegally overcharged its customers, nor did the department's failure to detect the company's increase in its base rates (another component of the total amount gas customers pay) without seeking an adjustment pursuant to G. L. c. 164, § 94. [636-637]

This court concluded that the Department of Telecommunications and Energy

(department) acted well within its general supervisory authority over utility costs when it ordered the retroactive adjustment of a gas company's supplemental cost of gas adjustment clause (CGAC), where retroactivity was inherent in the CGAC, which adjusted semi-anually for utility costs as they actually had been incurred, according to a mechanically applied technical formula [637-639]; moreover, such adjustment did not constitute ratemaking subject to the requirements of G. L. c. 164, § 94, but rather constituted permissible corrective action in response to an error in the calculation of the CGAC, governed by regulations expressly providing the department authority to investigate the CGAC and to modify its application of the CGAC, and promulgated pursuant to the the department's authority to protect consumers under G. L. c. 164, § 76 [639].

An order by the Department of Telecommunications and Energy that a gas company refund its customers for overcharges did not constitute a confiscation in violation of arts. 1, 10, and 12 of the Declaration of Rights of the Massachusetts Constitution and the Fourteenth Amendment to the United States Constitution. [639-641]

The petitioner in an action for review of an agency decision ordering the petitioner to disgorge unlawful profits was not materially prejudiced by the agency's exclusion from evidence of certain notes and analyses made by an agency staff member who had no decision-making authority and whose testimony would have been merely cumulative of uncontroverted evidence, and by the agency's reliance on materials not in the record. [641]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 3, 2003.

The case was reported by *Cordy,* J.

*Scott J. Mueller (Meabh Purcell* with him) for the plaintiff.

*Pierce O. Cray,* Assistant Attorney General, for the defendant.

MARSHALL, C.J. In May, 2001, pursuant to an investigation launched on its own initiative, the Department of Telecommunications and Energy (department)[1] determined that, for a period of 139 months between 1987 and 1998, Fitchburg Gas and Electric Light Company (Fitchburg) overcharged its gas customers by including identical inventory finance charges (IFCs) in both its base rate and its supplemental cost of gas adjustment clause (CGAC). The department calculated the amount of double billing at $675,052 and ordered Fitchburg to refund that amount to its ratepayers, with interest, over a similar period. Fitchburg appealed pursuant to G. L. c. 25, § 5. A single justice of this court reserved and reported the matter, without decision, to the full court. We affirm.

---

[1]In 1997, the Legislature renamed the Department of Public Utilities the Department of Telecommunications and Energy. St. 1997, c. 164, § 186.

1. *Background.* We begin with a general overview of the relevant statutory and regulatory background. The department is authorized by the Legislature to enforce legislation and to promulgate rules and regulations governing the provision of telecommunications and energy services within the Commonwealth. Among its other duties, the department regulates the rates a gas company may charge to its retail customers, or "ratepayers." See G. L. c. 164, § 1E (authority to establish rules and regulations for gas company base rates); G. L. c. 164, § 58 (procedures for gas and electricity price regulation); G. L. c. 164, § 76 (general supervision of gas companies).

Two kinds of regulated gas company charges are at issue in this appeal: the base rate and the CGAC, both of which are components of the total amount ratepayers pay for gas services in Massachusetts. See 220 Code Mass. Regs. § 6.06 (1993). The base rate is the principal device through which a gas company operating within the Commonwealth generates revenue from its ratepayers. See *Boston Gas Co.* v. *Department of Telecom. & Energy*, 436 Mass. 233, 234 (2002). During the relevant period, a gas company's base rate was determined on a "cost of service/rate of return" basis, calculated to permit utilities to recover reasonable operating expenses and to earn a fair return on investment. See *Boston Gas Co.* v. *Department of Telecom. & Energy*, 436 Mass. 233, 234 (2002). Base rates are established in departmental proceedings conducted in accordance with G. L. c. 164, § 94, which, among other things, requires the department to hold a public hearing on, and to investigate the propriety of, any requested base rate changes, and to inform the Attorney General of the proposed changes. G. L. c. 164, § 94.[2] Base rates are then set prospectively, based on historical data, i.e., a "test year," from which the gas

---

[2]General Laws c. 164, § 94, states in pertinent part: "Rates, prices and charges in such a schedule may, from time to time, be changed by any such company by filing a schedule setting forth the changed rates, prices and charges, but until the effective date of any such change no different rate, price or charge shall be charged, received or collected by the company filing such a schedule from those specified in the schedule then in effect; provided, that a company may continue to charge, receive and collect rates, prices and charges in accordance with a contract heretofore lawfully entered into, or, until the

company projects its future costs based on various estimates. See *Boston Gas Co.* v. *Department of Telecom. & Energy, supra* at 234-235; *Boston Edison Co.* v. *Department of Pub. Utils.,* 375 Mass. 1, 6, 7 (1978). Once established by the department, a base rate does not fluctuate with a gas company's actual costs, but only changes when the company files for, and pursuant to the procedures set out in G. L. c. 164, § 94, the department approves, a base rate change. See *Boston Gas Co.* v. *Department of Telecom. & Energy, supra* at 234, 235.

In contrast, the CGAC is a price component established by departmental regulations that permits a utility, on a semi-annual basis, to recoup the actual costs of gas by passing those costs on to the ratepayers. See 220 Code Mass. Regs. § 6.06; G. L. c. 164, §§ 76, 76C. The department computes the CGAC according to a complex mathematical formula that factors both projected gas costs for a certain period and a "reconciliation adjustment" of the difference between the actual costs incurred during the relevant period and the forecast. See 220 Code Mass. Regs. §§ 6.06-6.08 (1993). Unlike the base rate, which is not subject to retroactive adjustment and may only be changed pursuant to the hearing procedures set out in G. L. c. 164, § 94, the CGAC "may, for good cause shown, be modified by the [d]epartment" in such manner as it "may determine to be in the public interest." 220 Code Mass. Regs. §§ 6.02, 6.12(1) (1993). See *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.,* 368 Mass. 599, 601-602 (1975) (describing history and function of fuel adjustment clauses).

Inventory finance charges are charges that a company may

department otherwise orders, after notice to the company and a public hearing and determination that public interest so requires, may sell and distribute gas or electricity under a special contract hereafter made at rates or prices differing from those contained in a schedule in effect, providing a copy of the contract in each instance is filed with the department . . . . Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select."

440 Mass. 625 (2004)                                    629

Fitchburg Gas and Electric Light Company v. Department of Telecommunications and Energy.

incur when it borrows money to purchase gas inventory.[3] From 1979[4] until 1987, the department permitted gas companies to include the cost of IFCs in either their base rate or their individually developed CGAC, so long as these costs were not included in both charges. See, e.g., Haverhill Gas Co., D.P.U. 246, at 2, 4 (1980); Bay State Gas Co., D.P.U. 962, at 1-2 (1982). In 1987, the department adopted a uniform CGAC formula that included IFCs.[5] Wyman-Gordon Co., D.P.U. 1669-C (1987). 220 Code Mass. Regs. § 6.06. Including IFCs in the CGAC rather than in the base rate allows a gas company to pass fluctuations in its interest rate costs on to consumers in a speedier, less expensive, and more market-sensitive manner than if the company were required to adjust its IFCs through the costly base rate proceedings set out in G. L. c. 164, § 94. For this reason, gas companies generally favor including IFCs in their CGAC. See, e.g., Bay State Gas Co., D.P.U. 962, *supra* at 8-10.

We summarize the facts as found by the department and in the undisputed record on appeal. In 1984, Fitchburg applied for an increase in its base rate, using 1983 as its "test year" from which to project its future costs. Fitchburg's 1983 base-rate costs included IFCs, and it sought to include IFCs in the prospective new base rate. Before the department could approve

---

[3]Gas companies procure and store gas to meet future customer demand, particularly seasonal demand. Because a company is not paid until after the gas is distributed to its customers, a gas company incurs expenses for the purchase of gas inventories that are realized either through capital expenditure or short-term borrowing. See Fitchburg Gas & Elec. Light Co., D.T.E. 98-51, at 16 (1998) ("A company is entitled to be reimbursed for the costs associated with using its own funds or for the interest expense it incurs on funds borrowed for this purpose").

[4]In 1979, the department established a standard CGAC to replace the company-specific CGAC. D.P.U. 4240-78/19806, at 2-3 (1979). Concerned lest the rules change lead to overlapping base rate and CGAC charges, the department expressly directed utility companies to be prepared in future rate cases to "show in detail how its [base] rates are being modified to comply with the standard [CGAC]." *Id.* at 9.

[5]The current version of the applicable regulation states: "Total inventory finance charges — As billed in each peak season in anticipation of subsequent off-peak season charges. The total shall represent an accumulation of the projected charges as calculated using the monthly average of financed inventory at the existing (or anticipated) financing rate through a trust or other financing vehicle." 220 Code Mass. Regs. § 6.06 (1993).

the requested base rate increase, and for reasons unrelated to the present litigation, Fitchburg and the Attorney General negotiated a settlement that reduced Fitchburg's requested base rate increase from $1,450,983 to $816,218. The settlement, which was subsequently approved by the department, did not include any description or specific breakdown of the cost components in the base rate, and did not contain any discussion of IFCs.

Fitchburg did not include IFCs in its CGAC in 1983, 1984, 1985, or 1986. In 1987, when the department first included IFCs in a standardized CGAC formula promulgated by regulation, Fitchburg began to include IFCs in its CGAC. Between 1987 and 1998, Fitchburg regularly submitted CGAC on a semi-annual basis to the department. See 220 Code Mass. Regs. § 6.06. The department, pursuant to its standard policy, gave Fitchburg's CGAC applications "tentative" approval, while expressly reserving the right to review and require changes to the CGAC application, including modifications that "require the [c]ompany to refund to its customers any amounts that are found by the [d]epartment to be the result of imprudent [c]ompany action." However, in that period, the department never required Fitchburg to adjust the amount of the IFCs in its CGAC, and costs were passed on to ratepayers.

Fitchburg did not seek to raise its base rate again for fourteen years, until 1998. See Fitchburg Gas & Elec. Light Co., D.T.E. 98-51, at 1 (1998). During the 1998 base rate increase proceedings, Fitchburg included IFCs in its 1997 "test year," thereby alerting the department that Fitchburg might be collecting IFCs in its base rate in addition to its CGAC. On November 1, 1999, the department, on its own initiative, commenced an investigation to determine "(1) whether any over-collecting of a return on gas inventory by Fitchburg has occurred; (2) the amount of any over-collection; and (3) whether Fitchburg's ratepayers are entitled to reimbursement resulting from an over-collection."

Between March 14, 2000, and February 15, 2001, the department held hearings at which both Fitchburg and the Attorney General, as an intervener, presented documentary and testimonial evidence. See G. L. c. 12, § 11E. On May 31, 2001, the department issued its investigative order. It found that from May 1, 1987, to November 30, 1998 (a period of 139 months), Fitch-

burg improperly overcharged its ratepayers by including IFCs in both its base rate and its CGAC. The department determined that the overcharges amounted to $675,052, and ordered Fitchburg to repay that amount to its ratepayers, with interest. See 220 Code Mass. Regs. § 6.08(2) (1993). To "strike[] an appropriate balance between the need to make ratepayers whole for the overcharges and the need to maintain the financial integrity of the [c]ompany," the department permitted Fitchburg to amortize its payment to customers for a period not to exceed 139 months.[6]

Fitchburg filed a timely notice of appeal from the department's final order, pursuant to G. L. c. 25, § 5. On January 22, 2003, the single justice reserved and reported the case to the full court.

2. *Standard of review.* The standard of review for petitions under G. L. c. 25, § 5, is well settled:

> "[A] petition that raises no constitutional questions requires us to review the department's finding to determine only whether there is an error of law. . . . The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14. We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7)." (Citations omitted.)

*Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997). On appeal, Fitchburg challenges the substantiality of the department's factual findings, the correct-

---

[6]Fitchburg was given thirty days to file a revised CGAC reconciliation factor in compliance with the department's order. Fitchburg filed a motion with the department to stay enforcement of the order pending the outcome of its appeal. The motion was denied. Subsequently, Fitchburg filed a motion in the county court for a stay of the department's order. A single justice denied the motion on November 16, 2001. Fitchburg began to implement the refund in bills for services rendered on or after November 1, 2001.

ness of its conclusions that any overcharges were illegal, the department's authority to order a refund of the overcharges, and certain evidentiary rulings. We turn to the merits.

3. *Substantial evidence.* Fitchburg claims that, in the absence of evidence that a specific amount in its 1984 base rate was attributable to IFCs, the department lacked substantial evidence that the company double charged consumers. We disagree.

For purposes of administrative proceedings, substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). In considering the substantiality of evidence in an administrative proceeding, we accord due weight to the " 'experience, technical competence, and specialized knowledge' of the department," *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 261 (1987), quoting G. L. c. 30A, § 14 (7), and reverse only if "the cumulative weight of the evidence tends substantially toward opposite inferences." *Cobble* v. *Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 391 (1999). "The appealing party carries the burden of showing that the order appealed from is unsupported by substantial evidence." *Boston Gas Co.* v. *Department of Telecom. & Energy*, 436 Mass. 233, 237 (2002).

Here, notwithstanding that neither Fitchburg, the Attorney General, nor the department could adduce a specific amount attributable to IFCs from Fitchburg's 1984 base rate, the evidence was strong that IFCs were included in that base rate. The evidence showed conclusively that the company was recovering IFCs through its base rate prior to 1984, including in its 1983 "test year," as a component of the materials and supplies costs in its base rate; that Fitchburg proposed to include IFCs in the 1984 base rate increase; and that the 1984 settlement did not exclude the collection of IFCs from Fitchburg's base rate in 1984. Fitchburg's pre-1984 collection of IFCs was consistent with well-established industry practice in the 1980's, as allowed by the department. See *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 604-605 (1975) (fact finder may consider department's "long administrative understanding and practice"). Fitchburg's own witness testified to the reasonableness of the inference that the company

440 Mass. 625 (2004)                                                633

Fitchburg Gas and Electric Light Company *v.* Department of Telecommunications and Energy.

included IFCs in its 1984 base rate.[7] Moreover, as the department noted in its findings, the fact that Fitchburg included IFCs in its prospective 1998 base rate application, based on a 1997 "test year" including such charges, is effectively "an admission by [Fitchburg] in its filing, albeit now inconvenient to or against the interest of its present claim, to the effect that [Fitchburg] considered IFCs to be part of its established rates dating from [the 1984 rate]." From this and other evidence, the department could reasonably infer that Fitchburg included IFCs in its 1984 base rate, and continued to collect IFCs in its base rate until it sought a base rate adjustment in 1998. See, e.g., *Cobble* v. *Commissioner of the Dep't of Social Servs.*, *supra* at 390 (agency may draw fair inferences from evidence). That the exact amount of IFCs collected through the base rate is unknown does not detract from the substantial weight of the evidence demonstrating that such charges were included in the base rate.

It is undisputed that, in addition to whatever IFCs Fitchburg recovered through its base rate, it collected $657,052 for the IFCs in its CGAC from 1984 through 1998. We agree with the department that it is reasonable to conclude that $657,052 represented the amount by which Fitchburg overcharged its ratepayers because, having fully exercised its option to include IFCs in the base rate, any concurrent IFCs that Fitchburg included in the CGAC were by definition excessive.

4. *Conclusions of law.* Fitchburg maintains that, even if it could be shown that it double counted its IFCs, or regardless whether it could be shown to have double counted them, such overcharges were not illegal as a matter of law. The company argues, in fact, that the department knew of and permitted the

[7]For example, one Fitchburg witness testified that a utility could be expected to assume that an undisputed item in a proposed filing, such as the IFCs at issue here, would be included in a settlement reached with the government. She also testified that failure to include any amount for gas inventories in the 1983 base rate would have been inconsistent with the company's obligation to consumers to have enough gas on hand to meet peak winter demand.

Given the latter testimony, the department acted well within its discretion to conclude that the testimony of a Fitchburg witness who characterized the reference to IFCs in the base rate request as a "placeholder" was "to put it with restraint, implausible." See *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 120 (1978) ("It is for the agency, not the courts, to weigh the credibility of witnesses and resolve factual disputes").

overcollection as a matter of policy. The company maintains that, by deleting from its final CGAC standardization regulations the requirement that gas companies that wish to include IFCs in their CGAC submit to base rate proceedings, the department made a policy decision that speedy implementation of the new CGAC mechanism was more important than ensuring accuracy of charges to consumers. Compare Wyman-Gordon Co., D.P.U. 1669-A, Attachment (1986),[8] with 220 Code Mass. Regs. §§ 6.01-6.13 (1993).

The fundamental flaw in this argument is the presumption that the department acted directly counter to the Legislature's intent to protect ratepayers from overreaching by public utilities. See G. L. c. 164, § 76 (department exercises "general supervision" over utilities to ensure that they conduct business "with reference to the safety and convenience of the public"). Fitchburg requires us to presume that the department, in the interests of expediency, shirked its primary mission, to prevent overpricing by companies whose product is vital to the conduct of everyday life. See, e.g., *Commonwealth Elec. Co.* v. *Department of Pub. Utils.*, 397 Mass. 361, 369 (1986) ("We note that the [department's] role in guarding the ratepayers' interests and assuring that utility companies are not encouraged to avoid their responsibilities is supported by long-standing decisions in which we have found the legislative purpose to be protection of ratepayers"); *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 558 (1908) ("we have adopted, in this State, legislative regulation and control as our reliance against the evil effects of monopoly"). Absent much stronger evidence than Fitchburg has brought to bear in this appeal, we presume that the department's practices, policies, and procedures further rather than inhibit its objectives and responsibilities. See, e.g., *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997); *Commonwealth Elec. Co.* v. *Department of Pub. Utils.*, *supra* at 368, 369.

---

[8]Proposed 220 Code Mass. Regs. § 6.03, which was not adopted, stated: "The date on which this clause is to become effective for each utility shall be determined by the [d]epartment. Implementation may be delayed pending a review of a utility's allocated cost of service study and in conjunction with any adjustments to base rates determined to be appropriate by the [d]epartment." See Wyman-Gordon Co., D.P.U. 1669-A, Attachment (1986).

Here, the department's regulations standardizing a new CGAC filing must be read against the backdrop of a number of administrative cases decided in 1979 and the 1980's requiring gas companies to adjust their base rate if costs formerly included in the base rate were recouped through the CGAC. See Investigation by the Department, D.P.U. 4240-78/19806, at 9-10 (1979).[9] See also Haverhill Gas Co., D.P.U. 246, at 7 (1980) (gas company to adjust its base rate to exclude IFCs); Boston Gas Co., D.P.U. 123, at 11-12 (1980) (same); Bay State Gas Co., D.P.U. 962, at 9 (1982) (same); Colonial Gas Co., D.P.U. 1126, at 6 (1982) (same) Contrary to Fitchburg's arguments, the new CGAG regulations did not abrogate the prohibition against double charging implicit in those cases. They merely increased the number of options a company has for recouping IFCs, while leaving intact the prohibition against double billing.[10] Even if we accept Fitchburg's argument that the base rate hearing requirement was deleted from the final regulation in order to spare consumers the pass-along expense of base rate litigation costs, we do not see how such a policy decision translates into an endorsement of overcharging.

We reject Fitchburg's claim that the department failed properly to put the company on notice that it may not double charge its customers. A gas company must be in "compliance with the provisions of law and the orders, directions and requirements of the department," G. L. c. 164, § 76, and the depart-

[9] With regard to other costs that might be included in either the base rate or the CGAC, the department has stated explicitly that a gas company may not collect the same cost twice. Wyman-Gordon Co., D.P.U. 1669-B, at 10 (1987) ("Companies proposing to include production gas costs in [the CGAC] would be required . . . to identify the amounts in excess of the level included in base rates").

[10] Fitchburg had a number of available options for correctly charging for IFCs after standardization of the CGAC. It could have elected to keep the IFCs in its base rate and "zeroed out" the amount for IFCs in the standardized CGAC. It could have sought a new base rate hearing to eliminate IFCs from the base rate prior to including them in the CGAC, or, more practically, it could have avoided the base rate proceeding procedures by requesting a voluntary reduction in its base rate. Hearings pursuant to G. L. c. 164, § 94, are not required for such voluntary reductions, and Fitchburg had used the voluntary reduction procedure on at least one prior occasion, in 1993, to permit its customers to benefit from the reduced expenses realized by a debt financing. See Fitchburg Gas & Elec. Light Co., D.P.U. 93-168A, at 5 (1993).

636         440 Mass. 625 (2004)

Fitchburg Gas and Electric Light Company *v.* Department of Telecommunications and Energy.

ment may establish such policies through adjudicatory proceedings. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 383 Mass. 675, 679 (1981). Fitchburg knew, or should have known, of the considerable body of precedent proscribing the practice of double billing. Cf. *id.* at 679-680. These administrative rulings, no less than common sense, should have alerted Fitchburg to the impropriety of its billing practices.

We also find no merit in Fitchburg's argument that its overcharges were reasonable in light of the department's repeated approval of its CGAC during the relevant period. The department's failure to detect Fitchburg's overbilling practices for a period of over eleven years, while regrettable, does not immunize the company from the consequence of having acted illegally. See *LaBarge* v. *Chief Admin. Justice of the Trial Court*, 402 Mass. 462, 468 (1988) ("the doctrine of estoppel is not applied against the government in the exercise of its public duties"); *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 693 (1982) ("This court has been reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest"); *Doris* v. *Police Comm'r of Boston*, 374 Mass. 443, 449 (1978) ("It would indeed be a most serious consequence if we were to conclude that the inattention or inactivity of government officials could render a statute unenforceable and thus deprive the public of the benefits or protections bestowed by the Legislature"). Similarly, we are unmoved by Fitchburg's argument that, because its base rates were not as high as they legally could have been, any overcharge of IFCs should be credited against the amount the company would have collected had it sought and obtained a base rate change earlier than 1998. That Fitchburg voluntarily refrained from seeking an increase in its base rate from 1984 to 1998 has no bearing on the question whether the charges it did collect were improper. To hold otherwise would be to permit a gas company to increase its base rates by stealth in violation of G. L. c. 164, § 94.[11]

In short, Fitchburg has failed to carry its heavy burden of

---

[11]Although the department has a general power to investigate utilities under G. L. c. 164, § 76, it does not have the power to initiate a new base rate proceeding absent a company's request. G. L. c. 164, § 94.

proving that its overcharges were either permitted or endorsed (tacitly or explicitly) by the department.[12]

5. *Scope of authority.* We next consider whether, as Fitchburg claims, the department's refund order constitutes retroactive rulemaking in violation of its statutory authority. It is well established that the department may not order retroactive adjustments (either up or down) of a gas company's base rate. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 6 (1978) ("a rate increase may not be awarded retroactively as matter of law"). See also *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 44-45 (1979); *Fryer* v. *Department of Pub. Utils.*, 374 Mass. 685, 689-690 (1978); *Newton* v. *Department of Pub. Utils.*, 367 Mass. 667, 678 (1975); *Metropolitan Dist. Comm'n* v. *Department of Pub. Utils.*, 352 Mass. 18, 26-27 (1967). See generally Krieger, The Ghost of Regulation Past: Current Applications of the Rule against Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 984. The rule against retroactive ratemaking finds its source in the statutory construction of G. L. c. 164, § 94, which mandates determination by the department, after a public hearing and an investigation, of the "propriety" of the new base rate. See, e.g., *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 605-606 (1975); *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 494-495 & n.31 (1973); *Metropolitan Dist. Comm'n* v. *Department of Pub. Utils.*, *supra* at 26.

We have not previously been asked to determine whether the rule against retroactive ratemaking should be applied to adjustments in the CGAC, but we have no difficulty in concluding that an order retroactively adjusting a CGAC is well within the department's general supervisory authority over utility costs, see G. L. c. 164, § 76, and is consistent with its "broad authority to determine ratemaking matters in the public interest." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass.

---

[12]Fitchburg also argues that it was not required to obtain approval of a financing vehicle, see 220 Code Mass. Regs. § 6.06, before including IFCs in its CGAC. This matter was the subject of other administrative proceedings, and we need not address it here. Only the overcharging claims are at issue on this appeal.

856, 868 (1997).[13] Retroactivity is inherent in the very nature of a CGAC. Unlike the base rate, which is a calculation of rates going forward based on historical data, the CGAC adjusts semi-annually for utility costs as they actually have been incurred, according to a mechanically applied technical formula. See *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils., supra* at 606. The formula itself is a fixed "rate" that cannot be changed outside the hearing procedure mandated by G. L. c. 164, § 94. See *id.* at 604. But the "dollars and cents" amount inserted into the flow-through formula is presumptively not fixed. *Id.* They represent costs over which utilities often have little bargaining power or control, and it would defeat the very purpose of a CGAC to require these costs to be frozen until the expensive and cumbersome process of a rate change hearing is completed. See *id.* at 606-607 (it would be "incongruous" to require a § 94 rate proceeding before passing cost fluctuations onto ratepayers, because "the clauses were designed precisely to avoid those proceedings except where changes were being proposed in the clauses themselves").[14] See also *Newton* v. *Department of Pub. Utils.,*

---

[13]Because we conclude that the department had the authority to adjust a CGAC retroactively, we do not consider the department's argument that Fitchburg should be estopped from claiming that the refund order constitutes retroactive ratemaking because it had previously sought a retroactive adjustment in its CGAC. See *Rock* v. *Massachusetts Comm'n Against Discrimination,* 384 Mass. 198, 200 n.4 (1981) ("Since we find no error in the commission's order . . . we do not reach these [procedural] issues").

[14]After these petitioners had challenged the increase to their electricity bills, but prior to this court's decision, the Legislature enacted St. 1974, c. 625, § 1, which requires that an electric company cannot charge a customer under a fuel adjustment clause without the department's approval after a public hearing. *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.,* 368 Mass. 599, 612 (1975). See G. L. c. 164, § 94G (governing fuel adjustment charges for electric companies).

Because we have long held that changes to fuel adjustment clauses are not ratemaking subject to the requirements of G. L. c. 164, § 94, *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils., supra,* we do not agree with Fitchburg that the Legislature's failure specifically to authorize these adjustments, as it did with electric companies, see G. L. c. 164, § 94G, indicates a legislative intent to limit the department's authority to adjust the gas CGAC. See *Massachusetts Respiratory Hosp.* v. *Department of Pub. Welfare,* 414 Mass. 330, 333 n.4 (1993) (A subsequent amendment "should be given no weight as 'demonstrating' that no such authority existed before its

*supra* at 679 n.12 (distinguishing power to order rate rebate for inadequate telephone service under G. L. c. 159, with its "specific sections relating to the regulation of rates and service," from the general ratemaking powers of G. L. c. 164, § 76C, and regulations issued thereunder).

Furthermore, CGAC are governed not by G. L. c. 164, § 94, but by regulations promulgated pursuant to the department's general supervisory powers as conferred by the Legislature in G. L. c. 164, § 76. These regulations expressly give the department authority to investigate the CGAC, see 220 Code Mass. Regs. § 6.12(4), and to modify the application of the CGAC. See 220 Code Mass. Regs. § 6.02. Fitchburg does not challenge these regulations. Here, the department is not ordering a refund of wrongly projected excessive profits, but taking corrective action in response to an error in the calculation of the CGAC. Such corrective measures are well within its authority to protect consumers. See G. L. c. 164, § 76. As we stated in another regulatory context, a regulatory body correcting "a mistake in the expense allowance resulting from the improper use of data" does not engage in a " 'second look' that violate[s] the prohibition on retroactivity." *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 425 Mass. 262, 267 (1997) (regulation of automobile insurance rates). See *Daily Advertiser* v. *Trans-La*, 612 So. 2d 7, 25 (La. 1993) ("By implication, the commission's ongoing authority to investigate fuel cost adjustments passed on through such clauses includes the power, when necessary, to take corrective measures and to order refunds for charges not prudently incurred").[15]

As for the specifics of the refund order itself, we reject Fitch-

enactment. To conclude otherwise might discourage the Legislature from eliminating uncertainties in existing legislation for fear that courts might construe its action as an admission that theretofore an agency lacked authority to act in a questioned area").

[15]Although statutes regulating gas companies do vary, it is instructive to note that other States that have examined this issue have also concluded that fuel adjustment clauses are not retroactive ratemaking. See, e.g., *Daily Advertiser* v. *Trans-La*, 612 So. 2d 7, 23 (La. 1993) (noting "in most jurisdictions, the commission implements such clauses pursuant to its plenary rate making authority," but because adjustments "go into effect without an antecedent reasonableness review" a commission is "not precluded by the rule against retroactive rate making from subsequently examining and modifying such

640 440 Mass. 625 (2004)

Fitchburg Gas and Electric Light Company v. Department of Telecommunications and Energy.

burg's argument that the department's order constitutes a confiscation in violation of arts. 1, 10, and 12 of the Declaration of Rights of the Massachusetts Constitution and the Fourteenth Amendment to the United States Constitution. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10-11 (1978) ("Confiscation occurs when the Department's ratemaking decision deprives a utility of the opportunity to realize a fair and reasonable return on its investment"). Ordering an entity to disgorge unlawful profits is not unconstitutional confiscation but rather a lawful responsibility of many administrative agencies,

---

adjustments"); *Ohio Power Co.* v. *Public Utils. Comm'n*, 54 Ohio St. 2d 342, 344-345 (1978) ("requirement of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions" and affirming refund order where "appellant's fuel adjustment charges to its customers included fuel costs . . . which had already been fully recovered"); *MGTC, Inc.* v. *Public Serv. Comm'n of Wyo.*, 735 P.2d 103, 107 (Wyo. 1987) (rule against retroactive ratemaking is "limited to general rate making proceedings, however, and should not be invoked to prevent adjustments in rates pursuant to automatic rate adjustment mechanisms"). See also Krieger, The Ghost of Regulation Past: Current Applications of the Rule against Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 1020 ("Most courts, however, have held that [fuel adjustment] reconciliation proceedings do not violate the retroactivity rule because the utility commissions have not approved the amounts collected under [fuel adjustment clauses] in 'general' rate making proceedings").

Similarly, other jurisdictions have determined that, pursuant to its general supervisory authority, a regulatory body overseeing a utility company may order a refund through a fuel adjustment clause. See, e.g., *Daily Advertiser* v. *Trans-La*, *supra* at 25 ("By implication, the commission's ongoing authority to investigate fuel cost adjustments passed on through such clauses includes the power, when necessary, to take corrective measures and to order refunds for charges not prudently incurred"); *Matter of Niagara Mohawk Power Corp.* 69 N.Y. 2d 365, 372-373 (1987) ("[T]he power to order refunds must be implied, for there is little purpose in reviewing fuel adjustment charges, and the consumer's interests are ignored, if corrective action is not authorized for imprudent expenditures automatically passed through to the ratepayers. Manifestly, a refund is justified when the charges passed through to ratepayers result not from marketplace conditions, which the adjustment allowances are intended to ameliorate, but from the utility's own inefficiency and mismanagement"); *Wisconsin Power & Light Co.* v. *Public Serv. Comm'n*, 181 Wis. 2d 385, 406 (1994) (Abrahamson, J., dissenting) ("Courts in other states have also concluded that a regulatory agency's authority to investigate fuel cost adjustments implies the power to order corrective measures and refunds as a result of such audits").

including the department. *Id.* We agree with the single justice that Fitchburg failed to show that the department erred in concluding that a refund payout period of 139 months will amply protect Fitchburg's "financial integrity." *Id.* at 10.

6. *Evidentiary issues.* Fitchburg was not, as it contends, materially prejudiced by the department's exclusion from evidence of certain notes and analyses made by a department staff member and by the department's reliance on materials not in the record. First, there was no error in excluding from evidence the notes and analyses of a staff member who had no decision-making authority within the department and whose testimony would, in any event, have been merely cumulative of the uncontroverted evidence that the department had failed to detect Fitchburg's overcharges during the relevant period. Second, we agree with Fitchburg that the department should not have included in its order a review of the practices of other gas companies, which it had not introduced in evidence. However, Fitchburg has failed to show that it was substantially prejudiced by the department's inclusion of the review.[16] See G. L. c. 30A, § 14 (7); *Trustees of Clark Univ.* v. *Department of Pub. Utils.*, 372 Mass. 331, 335 (1977); *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 639-640 (1971).

7. *Conclusion.* For the reasons set forth above, we remand the case to the county court where a judgment is to be entered affirming the department's findings that Fitchburg illegally overcharged its customers in the amount of $675,052, and its order requiring Fitchburg to reimburse its ratepayers for the overcharges in the manner specified by the department.

*So ordered.*

---

[16]Fitchburg's objection centers on a footnote in the department's order that states that the department reviewed the filings of other companies that had moved their IFCs from base rates into CGAC from the period 1987 through 1992, and "conclude[d] that no other [company] had been collecting IFCs concurrently through both base rates and the CGAC."