NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11979

MARCIA D. BELLERMANN & others[1] vs.  FITCHBURG GAS
AND ELECTRIC LIGHT COMPANY.


Worcester.    March 10, 2016. - July 29, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.[2]


Electric Company.  Public Utilities, Electric company.
    Practice, Civil, Class action, Consumer protection case.
    Consumer Protection Act, Class action, Unfair or deceptive
    act.


        Civil action commenced in the Superior Court Department on
January 7, 2009.

        Following review by this court, 470 Mass. 43 (2014), a
renewed motion for class certification was heard by Richard T.
Tucker, J., and a decision allowing class certification was
reported by him to the Appeals Court.

---

        [1] Paul O'Connell, doing business as Lunenberg Exxon, also
known as Lunenberg Gulf; Dee Anne Aylott; Gary H. Asher; Daisy
Bacener; Beverly Christensen; Catherine J. Clark; Carl E.
Fandreyer; Jacquelyn Poisson; Karen Thibeault; Genghis, Inc.;
and Evans on the Common, on behalf of themselves and all others
similarly situated.

        [2] Justice Duffly participated in the deliberation on this
case and authored this opinion prior to her retirement.

The Supreme Judicial Court granted an application for direct appellate review.

Gavin J. Rooney, of New Jersey (Anne W. Chisholm & Eric R. Passeggio with him) for the defendant.
C. Deborah Phillips (Barry M. Altman & Edwin H. Howard with her) for the plaintiffs.
Robin L. Main, for Massachusetts Electric Company & others, amici curiae, submitted a brief.

DUFFLY, J.   In Bellermann v. Fitchburg Gas & Elec. Light Co., 470 Mass. 43 (2014) (Bellermann I), we affirmed a Superior Court judge's denial of a motion for class certification of residential and business customers of the defendant, Fitchburg Gas and Electric Light Company (FG&E).[3]   In that case, the plaintiffs, who lost electric power during a major winter ice storm in 2008 that struck significant portions of the northeast (Winter Storm 2008), sought class certification under G. L. c. 93A, §§ 9 (2) and 11, for themselves and other users of electricity who were injured by FG&E's assertedly inadequate preparation for and response to Winter Storm 2008.  See Bellermann I, supra at 44-46.  The plaintiffs' efforts to obtain class certification in that case were premised on FG&E's asserted failure properly to prepare and plan for Winter Storm 2008, which prolonged the power outages the plaintiffs

_____

[3] Fitchburg Gas and Electric Light Company (FG&E) is a public utility company owned by Unitil Corporation.  It provides electricity to customers in the municipalities of Fitchburg, Lunenburg, Townsend, and Ashby.

experienced, and on FG&E's deceptive communications made before and during the storm that resulted in the plaintiffs' inability to plan for the extended outages.[4]  See id. at 45, 54.  We concluded that there was no abuse of discretion in the judge's determination that the record did not support class certification on these theories, because the asserted injuries suffered by class members were too dissimilar.  See id. at 53-57.

We also observed, however, that the plaintiffs had proposed an alternative theory of injury under G. L. c. 93A, §§ 9 (1) and 11, maintaining that they had "paid for a level of emergency preparedness, efficient restoration, and accurate information," prior to and during Winter Storm 2008, which FG&E unfairly and deceptively had failed to provide, and therefore that the services they received were worth less than what they had paid for those services.  See id. at 54 n.10.  Because the plaintiffs had not asserted this theory as a basis for recovery in their motion for class certification, we did not address it.  See Leardi v. Brown, 394 Mass. 151, 155 (1985).

Following our decision affirming the denial of the first

_____

[4] The plaintiffs conceded in their first appeal "that Winter Storm 2008 would have caused widespread power outages without the asserted failures by FG&E, and they [thus did] not seek to certify a class on the basis of such loss of power" alone. Bellermann v. Fitchburg Gas & Elec. Light Co., 470 Mass. 43, 54 (2014) (Bellermann I).

motion for class certification, the plaintiffs filed a renewed motion in the Superior Court for class certification, pursuant to G. L. c. 93A, §§ 9 (2) and 11, based on the same record, and premised on this alternate theory of injury. In their second motion for class certification, the plaintiffs contended that, beginning in 1992, and extending for a period of some sixteen years, FG&E failed to comply with Department of Public Utilities (DPU) regulations regarding emergency storm preparedness.[5] They maintain that they suffered economic injury by overpaying for a level of emergency preparedness required by DPU's regulations, which FG&E unfairly and deceptively failed to provide, although the rates charged were based on FG&E's assumed compliance with those regulations.[6] The plaintiffs do not assert that members of

---

[5] Some of these regulations were issued or in effect between 1997 and 2007, when the Department of Public Utilities (DPU) was known as the Department of Telecommunications and Energy. See St. 1997, c. 164, § 186; St. 2007, c. 19, § 21.

[6] As a public utility, the rates FG&E charges its customers are set by DPU. See G. L. c. 164. The rate structure is determined through a "cost of service/rate of return" analysis, which permits a public utility company to earn a "fair return on investment," but disallows costs DPU deems unreasonable due to mismanagement, including regulatory noncompliance. See Fitchburg Gas & Elec. Light Co. v. Department of Telecomm. & Energy, 440 Mass. 625, 627 (2004); D.P.U. 11-01, 11-02 (2011). Where at least twenty customers file a complaint with DPU with regard to the quality or price of electricity, DPU must conduct a public hearing on the issue, and may order a prospective (but not retrospective) reduction in rates. See G. L. c. 164, § 93; Fitchburg Gas & Elec. Light Co. v. Department of Telecomm. & Energy, supra at 637. Here, as permitted under G. L. c. 164, § 93, after Winter Storm 2008, DPU sua sponte undertook to

the putative class suffered any loss of power or interruption of service, as a class, during this period.

Following a hearing, a different Superior Court judge certified two classes of FG&E business and residential customers who paid rates for electric service at any point between January 7, 2005, and January 7, 2009.[7] The judge then reported the class certification order to the Appeals Court, pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), on FG&E's motion, and we allowed FG&E's application for direct appellate review.[8]

We conclude that, in these circumstances, the plaintiffs' assertion of overpayment for FG&E's services does not set forth a cognizable injury under G. L. c. 93A, §§ 9 (1) and 11, and

investigate the quality of FG&E's response to the storm, and issued an order critical of FG&E's response in many respects. See D.P.U. 09-01-A, at 1 (2009), and discussion, infra. Shortly after that hearing, upon FG&E's request for an increase in its base rates pursuant to G. L. c. 164, § 94, DPU instead issued an order reducing the rates that FG&E would be permitted to charge for electricity in the future. See D.P.U. 11-01, 11-02, at 13-15. As DPU explained, the reduction in rates was in part due to FG&E's performance during Winter Storm 2008. See D.P.U. 11-01, 11-02, at 14, 50.

[7] Although the plaintiffs contend that FG&E was not in compliance with DPU's regulations for a period of sixteen years, the Superior Court judge certified the class for the period of four years immediately prior to the filing of the complaint in January, 2009, due to the applicable statute of limitations, G. L. c. 93, § 13.

[8] The parties also filed cross motions for summary judgment, which were denied. Those claims are not part of this appeal.

thus does not support class certification pursuant to that statute.  We therefore vacate the order certifying the class.[9]

1.  Background.  The facts underlying the plaintiffs' request for class certification are set forth in some detail in Bellermann I.  We briefly summarize those background facts that bear on the issues raised by the plaintiffs' renewed motion for class certification.  See Weld v. Glaxo Wellcome Inc., 434 Mass. 81, 85-86 (2001).

The plaintiffs' allegation that FG&E was unprepared for major storms throughout the class period is based on the results of an investigation into FG&E's preparation for and response to Winter Storm 2008, that was conducted by DPU pursuant to its regulatory authority.  See G. L. c. 164, §§ 1E, 76.  In a 215-page decision, DPU found that there had been "numerous and systematic" deficiencies in the way in which FG&E prepared for and responded to Winter Storm 2008.  D.P.U. 09-01-A, at xiii. DPU concluded that each of these deficiencies constituted a violation of FG&E's obligation to provide safe and reliable service.  See id. at 52, 60, 72, 83-84, 102, 121, 125.  As relevant here, DPU also found that some of the deficiencies stemmed from apparent disregard for certain of its prior

---

[9] We acknowledge the amicus brief of the Massachusetts Electric Company, doing business as National Grid; the Nantucket Electric Company, doing business as National Grid; and Eversource Energy.

directives and orders concerning the manner in which electric companies in Massachusetts were to plan and prepare for major storms and other emergencies, that were in effect during the class period. For example, in 1992, also following a major storm, DPU ordered Massachusetts electric companies to assess their emergency response plans in relation to those of other electric companies, and to consider the impact of extreme weather in their planning activities. FG&E, however, did not undertake such an assessment, and according to the judge's report, at no point during the class period would FG&E's emergency response plan have been adequate to respond to a storm as extreme and widespread as Winter Storm 2008. As FG&E conceded during hearings before DPU, rather than preparing for a storm of that magnitude, it believed that it could "ramp up" its emergency operations to respond to such a severe storm.

In support of their renewed motion for class certification, the plaintiffs argued in essence that DPU's determination as to FG&E's regulatory noncompliance had been found as fact by the Superior Court judge who ruled on the first motion for class certification, that this finding established FG&E's regulatory noncompliance, and that the noncompliance was alone sufficient to support the plaintiffs' claim of economic injury. The plaintiffs contend that, in seeking class certification under G. L. c. 93A, §§ 9 (2) and 11, they were not required to show

that they suffered actual injury, such as an interruption in electrical service.

The crux of FG&E's argument in the Superior Court was that the plaintiffs' overpayment theory fails as a matter of law because it is premised on an incorrect assumption implicit in the plaintiffs' claim that they suffered an injury merely by paying a particular utility rate.[10]  The motion judge concluded, to the contrary, that the plaintiffs' overpayment theory of injury was viable, based on the plaintiffs' assertion "that they have paid for more in terms of quality and reliability of service than they received."  The judge certified two classes, one consisting of FG&E's residential customers and one of its business customers.

2. <u>Class certification</u>.  a. <u>Standard of review</u>.  Review of a decision on class certification is undertaken with due consideration of the broad discretion afforded in allowing or denying class certification.  Nonetheless, pursuant to G. L.

---

[10] FG&E also argues that the plaintiffs could not appropriately file their claim of economic injury in the Superior Court, because under G. L. c. 25, § 5, and G. L. c. 164, § 94, exclusive jurisdiction to review electricity rates rests with DPU and this court.  The plaintiffs contend that their claim was properly filed in the Superior Court because it involves unfair business practices relative to FG&E's lack of emergency preparedness, and is not related to FG&E's imposition of DPU's established rates.  See G. L. c. 93A, § 3 (exempting from treatment as "unfair business practice" transactions permitted by regulatory board of Commonwealth).  Because of the result we reach, we need not address this issue.

c. 93A, discretion to deny class certification is tempered by the "public policy of the Commonwealth [which] strongly favors G. L. c. 93A class actions." Feeney v. Dell Inc., 454 Mass. 192, 200 (2009). See Aspinall v. Philip Morris Cos., 442 Mass. 381, 391-392 (2004) (Aspinall). Although our "review asks only whether that discretion has been abused," an error of law in ordering a class certification renders that decision an abuse of discretion. Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 361 (2008), citing Weld v. Glaxo Wellcome Inc., 434 Mass. at 84-85.

To succeed in their motion for class certification under G. L. c. 93A, § 9 (2) or 11,[11] the plaintiffs must show that they are entitled to seek relief under G. L. c. 93A, § 9 (1) or 11, for injuries resulting from the defendant's unfair or deceptive act or practice.[12] The plaintiffs also must show that the

---

[11] As described in Bellermann I, 470 Mass. at 52, plaintiffs seeking class certification pursuant to Mass. R. Civ. P. 23 (a), as amended, 452 Mass. 1401 (2008), must meet additional requirements that are not necessary for class certification under G. L. c. 93A, § 9 (2) or 11. Thus, while "the requirements of rule 23 (a) provide a 'useful framework' for considering class certification under G. L. c. 93A," they do not equate with the requirements of class certification under G. L. c. 93A, § 9 (2) or 11. Bellermann I, supra at 53.

[12] General Laws c. 93A, § 2, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade of commerce." General Laws c. 93A, § 9 (1), permits a consumer "injured by another person's use or employment of any method, act or practice declared to be unlawful by" § 2 to bring an action for damages in the Superior Court. General Laws c. 93A, § 9 (2), further provides that

assertedly unfair or deceptive act or practice that caused their injuries "caused similar injury to numerous other persons similarly situated," and that they would "adequately and fairly represent[] such other persons."  G. L. c. 93A, §§ 9 (2), 11. See Bellermann I, 470 Mass. at 52.  The requirement of showing that a plaintiff suffered an injury may be met by showing either an economic or a noneconomic injury.  See Hershenow v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 790, 802 (2006). A party seeking class certification "need only provide 'information sufficient to enable the motion judge to form a reasonable judgment' that certification requirements are met." Aspinall, supra at 392, quoting Weld v. Glaxo Wellcome Inc., supra at 87.

With these standards in mind, we turn to consideration whether the plaintiffs have provided "information sufficient to . . . form a reasonable judgment" that they suffered an economic injury.  See id.

b.  Class certification claim under G. L. c. 93A, § 9.  The

"[a]ny persons entitled to bring [an] action [under G. L. c. 93A, § 9, for an unfair or deceptive act or practice] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated . . . bring the action on behalf of himself and such other similarly injured and situated persons."

General Laws c. 93A, § 11, contains a similar provision applicable to business plaintiffs.

plaintiffs argue that FG&E's regulatory noncompliance caused all of the putative class members to sustain similar economic injury by overpaying for a level of electric service that did not meet the standards that were "legally required and enforced by the government." See Iannacchino v. Ford Motor Co., 451 Mass. 623, 633 (2008) (Iannacchino). The argument that regulatory noncompliance alone is sufficient to establish an economic injury, however, misconstrues our decisions in Iannacchino and Aspinall. In those cases we recognized that, under some circumstances, a consumer may suffer an economic injury by purchasing a product or service that does not comply with applicable regulations. We stated clearly, however, that to meet the injury requirement under G. L. c. 93A, § 9 (1) or 11, a plaintiff must have suffered a "separate, identifiable harm arising from the [regulatory] violation" that is distinct "from the claimed unfair or deceptive conduct itself." Tyler v. Michaels Stores, Inc., 464 Mass 492, 503 (2013). See Iannacchino, supra at 630; Aspinall, supra at 397-398. By contrast, adoption of the plaintiffs' theory of economic injury would permit class certification under G. L. c. 93A, §§ 9 (2) and 11, whenever a product (or service) fails to conform to a regulatory requirement and the consumer alleges an economic injury based on overpayment for the product. Cf. American Tel. & Tel. Co. v. Central Office Tel., Inc., 524 U.S. 214, 223

(1998) ("Any claim for excessive rates can be couched as a claim for inadequate services and vice versa").

The plaintiffs in Iannacchino, supra at 624, for instance, brought an action as putative class representatives of all Massachusetts owners of certain vehicles manufactured by the defendant, asserting that the vehicles' outside door handles did not comply with applicable Federal safety regulations.  The plaintiffs did not argue that they had sustained any personal injury or property damage as a result of the nonconforming door handles.  Rather, they asserted that the defendant automobile manufacturer had engaged in unfair or deceptive conduct which injured them economically when the defendant knowingly sold, and refused to recall, vehicles that did not comply with Federal safety regulations.  Id.  We deemed the plaintiffs' assertion of regulatory noncompliance to be conclusory and therefore not sufficient to state a viable claim under the then-applicable pleading standard.  We concluded that, in order to assert a viable claim based on regulatory noncompliance, the plaintiffs were required to "include allegations that would connect the vehicles' failure on [certain] tests to a legal requirement," id. at 633, and remanded the matter to afford the plaintiffs the opportunity to do so under our clarified pleading standard.  Id. at 635-636.

One distinction in Iannacchino that is relevant to the

present circumstances is the fact that the putative class members in that case, all of whom had purchased the defendant's vehicles, "continue[d] to own the allegedly noncompliant vehicles" when the action was filed. See id. at 630. To meet the injury requirement of G. L. c. 93A, § 9 (1), we concluded that the putative class members were required to show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception" (citation omitted). Id. at 630 n.12. Observing that "vehicles are inherently dangerous in operation, and safety standards play a highly significant role in relation to them," id. at 630, we explained,

> "the purchase price paid by the plaintiffs for their vehicles would entitle them to receive vehicles that complied with . . . safety standards or that would be recalled if they did not comply. If [the defendant] knowingly sold noncompliant (and therefore potentially unsafe) vehicles or if [the defendant], after learning of noncompliance, failed to initiate a recall and to pay for the condition to be remedied, the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received. Such an overpayment would represent an economic loss -- measurable by the cost to bring the vehicles into compliance -- for which the plaintiffs could seek redress under G. L. c. 93A."

Id. at 630-631. Had the regulatory noncompliance alleged in Iannacchino been established, it would have been adequate to support a claim of economic injury, because each class member owned a vehicle that did not provide the advertised safety features. A noncompliant vehicle thus would be worth less to

its owner than a compliant one.  The owner of a noncompliant vehicle either would have to sell it for a lower price than would be obtainable for a compliant vehicle, reflecting the defect, or would have to incur additional expense to remedy the defect before selling the vehicle.

Similarly, in Aspinall, supra at 396-398, we held that putative class members who were consumers of a particular brand of cigarettes could bring a class action against the manufacturer for its knowingly false labeling conveying that the cigarettes delivered health benefits they did not in fact deliver.[13]  The manufacturer labeled the cigarettes as "light," in purported compliance with Federal regulations under which "light" cigarettes were those that delivered a lesser amount of toxins as compared to regular cigarettes.  Id. at 385-386.  The defendant's "light" cigarettes, however, delivered more toxins than were permitted under the regulation pertaining to "light" cigarettes.  Id.  We concluded that the putative class members "were injured when they purchased a product that, when used as directed, exposed them to substantial and inherent health risks that were not . . . minimized by their choice of the defendant's 'light' cigarettes."  Id. at 397.  Thus, because each putative

---

[13] The plaintiffs alleged in that case that, "as a result of the defendants' deceptive advertising, all consumers of Marlboro Lights in Massachusetts paid more for the cigarettes than they would have otherwise paid."  Aspinall v. Philip Morris Cos., 442 Mass. 381, 398-399 (2004) (Aspinall).

class member had purchased and smoked cigarettes that did not deliver the advertised health benefits, no class member received the advertised reduction in toxins for which each had paid. Id. at 397, 398 n.20. See Kwaak v. Pfizer, Inc., 71 Mass. App. Ct. 293, 300 (2008) (consumers "were paying for cigarettes that were marketed as light, lowered tar and nicotine cigarettes, but were not").

In sum, the putative class members in these cases suffered an economic injury because, during their usage or ownership, the defendants' products did not deliver the full anticipated and advertised benefits, and therefore were worth less, as used or owned, than what the plaintiffs had paid.[14] See, e.g., Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 479 (D. Mass. 2015) (consumer may establish economic injury under G. L. c. 93A, § 9 [1], if consumer "continues to have possession of" purchased item that does not deliver "the benefit of the bargain" of purchase).

The plaintiffs' theory of injury, here, however, is unlike the injuries recognized in Iannacchino and Aspinall. The plaintiffs do not claim that, as a result of FG&E's asserted regulatory noncompliance, they did not receive the electricity

---

[14] One measure of damages under G. L. c. 93A, § 9 (1), for this form of economic injury may be the difference in market value between the amount that the class members paid and the value of the nonconforming product received. See Iannacchino, supra at 631; Aspinall, supra at 399 n.23.

for which they paid during the class period.  Rather, they maintain that the noncompliance caused them to pay for emergency preparedness that they would not have received if an emergency had materialized during that time.  This claim of economic injury based on a potential inadequacy in emergency protection does not support class certification under G. L. c. 93A, §§ 9 (2) and 11,  because the plaintiffs received all the electric service for which they paid during the class period, and there is no longer any risk of injury for emergencies that did not occur.  See, e.g., Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 52 (D. Mass. 2015) (concluding that there was no economic injury under G. L. c. 93A, where plaintiff's use of product had "become final without any harm having materialized," and plaintiff no longer owned noncompliant product, because "the risk of injury had disappeared, and the plaintiff[s] had received the full benefit of the purchase").

The plaintiffs' claims here are similar to those in Hershenow v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 790, 802 (2006), where putative class members who had rented automobiles from the defendant rental company sought class certification on the basis of the defendant's regulatory noncompliance in the terms of its optional damage waiver clause. The clause permitted waiver, for an additional fee, of the rental company's potential claims against the renter should the

rented vehicle be damaged during the rental period.  Id. at 792. The damage waiver provision also contained several restrictions that purported to limit its application, for example if the vehicle were stolen, or left unlocked, or if the renter failed to report any damage to the proper authorities.  Id. at 792-793 & n.8.  These restrictions, however, did not comply with a Massachusetts statute which permitted invalidation of damage waiver clauses only under the narrow circumstances set forth in G. L. c. 90, § 32E 1/2.  Id. at 792-793.  Although the damage waiver provision did not comply with applicable regulations, none of the putative class members had been in an accident that triggered application of the damage waiver.  Since each of the putative class members had returned the rented vehicles undamaged, and the rental company had not attempted to enforce the invalid waiver provision against any of them, we concluded that no plaintiff had suffered the necessary, distinct injury that "is an essential predicate for recovery under" G. L. c. 93A, § 9 (1).  See Hershenow v. Enterprise Rent-A-Car Co. of Boston, supra at 791, 800-801 (each putative class member was no "worse off during the rental period than he or she would have been had the [damage waiver provision] complied in full").  Nor, once they returned the vehicles, were the plaintiffs any worse off because they had paid for a damage waiver that no longer exposed them to the risk of economic harm from an uninsured

collision.

Similarly, here, the plaintiffs would have suffered economic injury as a result of FG&E's asserted failure to prepare for a severe storm only if a major storm had occurred during the class period, and the plaintiffs subsequently had lost electric power as a result of FG&E's failure to respond adequately to the extreme weather conditions.  Since no severe storm occurred, and no plaintiff lost electric power during the class certification period as a result of FG&E's asserted lack of planning and preparedness for a nonexistent storm, none of the plaintiffs has demonstrated an economic injury.  See Roberts v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 811, 813-814 (2006) (no injury under G. L. c. 93A, § 9 [1], for defective product offered in rental contract when consumer did not purchase or use product).  Contrast Casavant v. Norwegian Cruise Line Ltd., 460 Mass. 500, 503-504 (2011) (viable economic injury claim under G. L. c. 93A, § 9 [1], where cruise line's policy did not comply with refund policy regulations and plaintiff sought, but did not receive, timely refund).

The plaintiffs here would have paid the same amount for compliant electric service as they did pay, and, although FG&E's regulatory noncompliance might have exposed them to the risk of receiving less electricity during an emergency than what they had paid for, none of the plaintiffs asserts a loss of electric

power during the class period, or that FG&E failed to provide any putative class member the electricity for which the plaintiff had paid.  The plaintiffs contend only that they suffered economic injury by purchasing a service that might have failed to provide them with emergency response services,[15] in circumstances that never happened.  See Rule v. Fort Dodge Animal Health, Inc., 604 F. Supp. 2d 288, 305 (D. Mass. 2009), aff'd, 607 F.3d 250 (1st Cir. 2010) (failure to warn of safety risks in dog heartworm medication did not give rise to claim of economic injury under G. L. c. 93A, § 9 [1], against medication manufacturer, where risks did not materialize and plaintiff no longer owned product).

In sum, because the plaintiffs have not met the threshold requirement of demonstrating an injury caused by "the use or employment of the unfair or deceptive act or practice," their claim that FG&E engaged in unfair or deceptive practices within the meaning of G. L. c. 93A, § 9 (2), by failing to comply with

---

[15] We emphasize, again, that not all regulatory noncompliance, even that violating "a regulation 'meant for the protection of the public's health, safety, or welfare,'" constitutes an unfair or deceptive act under G. L. c. 93A, § 2. Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 173, 176-177 (2013), and cases cited.  Whether a regulatory violation amounts to an actionable unfair or deceptive act is a question of law to be "discerned from the circumstances of each case" (quotation omitted).  Id.  DPU also has expressed some doubt whether its orders and directives are properly classified as "regulations."  D.P.U. 09-01-A, at 183-184.  Because of the result we reach, we do not address this issue.

departmental regulations, G. L. c. 93A, § 9 (1), cannot succeed.
Accordingly, the motion judge erred in certifying the two
classes pursuant to G. L. c. 93A, §§ 9 (2) and 11.

Conclusion.  The order allowing the plaintiffs' motion for
class certification, and certifying two classes, is reversed.
The matter is remanded to the Superior Court for further
proceedings consistent with this opinion.

So ordered.