NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-218                                        Appeals Court

   ROSA LAYES[1] & another[2]  vs.  RHP PROPERTIES, INC., & another.[3]


                        No. 18-P-218.

     Middlesex.     November 14, 2018. - August 28, 2019.

          Present:  Hanlon, Massing, & Ditkoff, JJ.


Mobile Home.  Manufactured Housing Community.  Oil and Gas.
     Regulation.  Consumer Protection Act, Unfair or deceptive
     act, Class action.  Practice, Civil, Summary judgment,
     Class action, Consumer protection case.



     Civil action commenced in the Superior Court Department on
April 22, 2015.

     Motions for summary judgment were heard by Kenneth J.
Fishman, J.; a motion for class certification was heard by S.
Jane Haggerty, J.; and the entry of judgment was ordered by
Fishman, J.

_____

     [1] On behalf of herself and all others similarly situated.

     [2] Francis Layes.

     [3] Chelmsford Group, LLC.  The defendants' third-party claims
against Gagnon Brothers Oil Company, Inc., and Leo Marchand,
Inc., doing business as Colonial Oil, successor in merger
between Chelmsford Colonial Oil, Inc., and Leo Marchand, Inc.,
were dismissed, and the defendants have withdrawn their appeal
from that decision.  The third-party defendants have not
participated in this appeal.

Ethan R. Horowitz for the plaintiffs.

Trevor J. Keenan for the defendants.

Maura Healey, Attorney General, & Daniel A. Less, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

HANLON, J.   RHP Properties, Inc. (RHP Properties), a large owner and operator of manufactured housing communities, has a nationwide policy requiring its residents to pay for the maintenance, repair, and replacement of their privately-owned, individually-metered fuel tanks.  The main question posed in this appeal is whether that policy passes muster under the provisions of the Manufactured Housing Act, G. L. c. 140, §§ 32A-32S (act), and the Attorney General's regulations promulgated thereunder, 940 Code Mass. Regs. §§ 10.00 (1996) (Attorney General's regulations).[4,5]  A judge of the Superior Court decided that it did not, and entered judgment for the individual plaintiffs, Rosa and Francis Layes.  We agree with that decision, but conclude that the denial of Rosa's[6] motion for class certification by another judge (motion judge) constituted

---

[4] We acknowledge the amicus brief submitted by the Attorney General.

[5] All citations to 940 Code Mass. Regs. §§ 10.00 are for the year 1996.

[6] To avoid confusion, we refer to Rosa and Francis Layes individually by their first names.

an abuse of discretion.  Accordingly, we affirm in part and reverse in part.

Background.  None of the operative facts is in dispute. Rosa and Frank Layes live at Chelmsford Commons, a manufactured housing community with approximately 250 home sites (Chelmsford Commons or CC park).[7,8]  The Layeses, like some eighty percent of the CC park residents, heat their manufactured home primarily with oil, which is stored in an above-ground tank situated on a cement pad adjacent to their home.  The oil tank serves only their home.[9]  Pursuant to their lease agreement, the Layeses and all CC park residents are responsible for purchasing their own fuel oil.

In 2006, the Layeses purchased a new tank.  The CC park rules at the time tied utility maintenance duties to the location of the systems; the park's operators were responsible for everything on the exterior of the homes, while residents

---

[7] Consistent with the unique nature of manufactured housing community living, the Layeses own their home, but rent the land on which their home sits.

[8] The majority of the CC park residents are elderly or disabled, and receive low to moderate income.

[9] The oil tank was situated eight inches from the home in plain view from the home's rear window; it had a fuel gauge on top.

were responsible for everything in the interior.[10]  However, par. 9.h of the rules specifically required the residents to maintain their own oil tanks.[11]

In April, 2011, RHP Properties purchased the CC park through the Chelmsford Group, LLC (Chelmsford Group) (collectively, defendants).[12]  Thereafter, a document titled "Chelmsford Commons Rules and Regulations," dated April 22, 2011, was circulated to the park residents showing that par. 9.h had been deleted.  (Paragraph 9 otherwise remained unchanged.)

---

[10] Paragraph 9 of the Rules of Chelmsford Mobile Home Park, effective September 30, 2008, the provision governing utilities, stated that

"a. . . .  The owner/operator shall provide, pay for, maintain, and repair systems for providing water, sewage disposal, and electricity up to the point of connection with each manufactured home, in accordance with applicable laws"; and

"b. . . .  The tenants are responsible for paying for the maintenance and repair of utilities from the point of connection to the manufactured home to the inside of the home."

[11] Paragraph 9.h of the Rules of Chelmsford Mobile Home Park, effective September 30, 2008, stated:

"Oil Barrels:  Tenants are responsible for the maintenance and upkeep of their oil tanks and are responsible for complying with all city and state ordinances."

[12] RHP Properties, the Chelmsford Group, and their property manager qualify as owners and "operators" of a manufactured housing community for purposes of the act.  See 940 Code Mass. Regs. § 10.01.

The Attorney General later approved the March, 2013, version of these rules, which contained the same allocation of maintenance duties as the 2011 rules and regulations.[13]

Notwithstanding these "official" CC park rules, the defendants implemented a policy placing all burdens and costs associated with the home heating oil systems on the residents.[14] The defendants required new and renewing residents to sign standard lease agreements that made the residents responsible for "the maintenance and replacement of any above ground oil or fuel storage tanks." The policy was described in an "addendum" to the park rules and was posted in the park management office.

---

[13] No park rule may be implemented without first submitting the proposed rule to both the Attorney General and the Director of the Department of Housing and Community Development for approval. See G. L. c. 140, § 32L (5). There is evidence in the record that, dating back to 1998, two years after the Attorney General's regulations were promulgated, the Attorney General's Office interpreted the regulations to place the duty to install, repair, and maintain above-ground oil tanks on the park owner.

[14] The Chelmsford Commons policy is consistent with RHP Properties' nationwide policy to hold park residents responsible for all aspects of their oil tanks, including maintenance, repair, replacement, and remediation work in the event of spills -- irrespective of the residents' negligence or misconduct. Joseph Carbone, an RHP Properties vice president, likened the fuel tanks to privately-owned automobiles. According to Carbone, if a privately-owned automobile leaks oil all over the home site, the resident should be responsible for the clean-up costs. RHP Properties applies the same reasoning to home heating fuel tanks.

The defendants admit that at no time have they maintained, repaired, or replaced any exterior components of the residents' home heating oil systems in the CC park.  They have required the residents to do the following with respect to the exterior components:  (1) the sanding and painting of rusted oil tanks; (2) the connection of the tanks to the homes and the removal of unused tanks; and (3) the installation of either protective sleeves on the fuel lines connecting the tanks to the homes or oil safety valves.[15]  Many residents who failed to perform this work at their own cost were threatened with legal action or were sued by the defendants.

On May 21, 2014, the Layeses smelled oil on their home site.  Francis discovered oil leaking from the bottom of the tank.  The Layeses immediately placed a container under the tank to catch the oil, and notified CC park maintenance employee Ronald Hennessey and their oil supplier, Gagnon Brothers Oil Company (Gagnon).  A Gagnon employee responded and pumped the remaining oil in the tank into a temporary transfer tank.  The compromised tank was removed from the site and destroyed.  Thereafter, Hennessey and an RHP Properties manager informed Rosa that it was the Layeses' duty to replace the tank.  The

---

[15] The third requirement was imposed in order to bring all oil tanks in the CC park into compliance with G. L. c. 148, § 38J (b).  See St. 2008, c. 453, § 3, effective September 30, 2011.

Layeses, who had two small children, could not afford the cost of a new tank. In September, 2014, the defendants rented a temporary tank for the Layeses and had it connected to their home.

When Rosa attempted to schedule an oil delivery in January, 2015, Gagnon refused to provide additional oil until the Layeses purchased a new permanent tank. Although Rosa contacted other oil suppliers, she was unable to find a supplier who would fill the temporary tank. For the rest of the 2015 heating season, the Layeses rationed their remaining oil supply. The temperature in their home routinely fell into the 50s (degrees, Fahrenheit) in the mornings. On August 24, 2015, the Layeses observed the Chelmsford Commons manager and a third party disconnect, drain, and remove the temporary tank from their home site.

Legal proceedings. On April 22, 2015, the Layeses filed a complaint, alleging that the defendants' failure to maintain, repair, and replace the exterior components of their home heating system (and those of the other residents of the CC park) violated the act, the Attorney General's regulations, and G. L. cc. 93A and 186. The defendants asserted counterclaims against the Layeses, alleging negligence and liability under G. L. c. 21E for the cleanup costs arising from the release of oil on the Layeses' home site. On November 2, 2015, with winter

approaching, a judge of the Superior Court issued a preliminary injunction requiring the defendants to provide the Layeses with a new fuel tank and to connect it to their home.[16]

Ruling on cross motions for summary judgment, a judge allowed the Layeses' renewed motion for partial summary judgment on their individual c. 93A claims and on the defendants' amended counterclaim. Another judge subsequently denied Rosa's motion for class certification. Final judgment in favor of the Layeses entered on their two substantive claims (under c. 93A and c. 186, § 14),[17] and the judge awarded them three months' rent in damages as well as attorneys' fees.[18] See G. L. c. 186, § 14.

---

[16] On August 29, 2016, the Attorney General's Office sent a letter to the CC park manager, instructing RHP Properties to stop enforcing the November, 2015, version of the CC park rules, which had never been submitted for the Attorney General's approval as required by G. L. c. 140, § 32L (5). See 940 Code Mass. Regs. § 10.02(4) (making it an unfair or deceptive act or practice for park operators to enforce unapproved rules). The letter indicated that the 2015 CC park rule required residents to maintain and to replace their above-ground oil tanks and that the rule violated the Attorney General's regulations; further, the letter requested that RHP Properties assume the maintenance duties required by the regulations. When the defendants failed to respond, the Attorney General's Office reiterated the position and the requests in a follow-up letter sent to RHP Properties' Michigan office.

[17] At the pretrial conference, the attorneys agreed that the remaining issues in the case could be decided on the papers without the necessity of a trial.

[18] To the extent that the defendants argue that the trial court's award was based solely on the G. L. c. 93A finding in the Layeses' favor, the amount of the award demonstrates that

The judge also dismissed the defendants' counterclaims and permanently enjoined the defendants "from implementing or engaging in any policies or practices that contravene or violate 940 Code Mass. Regs. §§ 10.03(2)(n) and 10.05(4)(d)." These timely cross appeals followed.[19]

As the defendants point out, were we to conclude that the judge erred in entering judgment for the Layeses on their individual claims, there would be no need to reach the merits of the certification ruling. We start our analysis there.

Discussion. A. Individual claims. 1. Standard of review. We review the allowance of a motion for summary judgment de novo, assessing whether, viewing the facts in the light most favorable to the nonmoving party (here, the defendants), the moving party (the Layeses) was entitled to judgment as matter of law. See Homeowner's Rehab, Inc. v. Related Corporate V SLP, L.P., 479 Mass. 741, 750 (2018). Courts construe regulations in the same way as statutes, applying traditional canons of interpretation. See Armata v. Target Corp., 480 Mass. 14, 19 (2018). The words of a

---

the judge imposed liability and statutory damages under G. L. c. 186, § 14.

[19] The defendants have not argued that the judge erred in dismissing their amended counterclaim. We therefore deem all counterclaims waived. See Abate v. Fremont Inv. & Loan, 470 Mass. 821, 833 (2015). In addition, we note that Francis is not a party to the appeal from the class certification ruling.

regulation are given their usual and ordinary meaning.  Id.  If the meaning of a term is clear, courts give effect to that language; but if the language is ambiguous enough to support more than one rational interpretation, courts will give effect to the interpretation that furthers the purpose of the framers. See Peterborough Oil Co., LLC v. Department of Envtl. Protection, 474 Mass. 443, 448 (2016).  The interpretation of a regulation is a question of law that is reviewed de novo.  See Morgan v. Massachusetts Homeland Ins. Co., 91 Mass. App. Ct. 1, 8 (2017).

2.  Statutory scheme.  "Both the Legislature and the courts of the Commonwealth have recognized that manufactured housing communities provide a viable, affordable housing option to many elderly persons and families of low and moderate income, who are often lacking in resources and deserving of legal protection."[20] Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 83 (1996).  The act was first enacted in 1939, in order to

---

[20] Once fully set up on a foundation at a particular site and connected to utilities, manufactured houses generally are not relocated.  See Commonwealth v. DeCotis, 366 Mass. 234, 238 (1974).  Thus, unlike tenants living in traditional residential housing, park residents cannot simply pack up their homes and move without losing a substantial asset.  As individuals of limited means with limited housing options, park residents may be especially vulnerable to unfair park rules.  See id. at 243 (tenants' willingness to pay resale fees where no services rendered therefor "demonstrate[d] the extent to which the [park owners] had their tenants at their mercy").

protect the rights of residents of mobile home parks.  See G. L. c. 140, §§ 32A-32S; Quinn v. Rent Control Bd. of Peabody, 45 Mass. App. Ct. 357, 359 (1998).  The law "provide[s] comprehensive and substantial rights to owners of manufactured homes who place such structures upon land rented by them." Danusis v. Longo, 48 Mass. App. Ct. 254, 255 (1999).

Over the course of time, the Legislature has subjected park owners to progressively more extensive regulations.  See Quinn, 45 Mass. App. Ct. at 359 n.4.  In 1993, the Legislature further strengthened the protections of the act in two ways relevant to this litigation.  First, the Legislature made any violation of the act's provisions a per se violation of G. L. c. 93A.  See G. L. c. 140, § 32L (7), as amended by St. 1993, c. 145, § 12; Quinn, 45 Mass. App. Ct. at 364 n.10.  At the same time, the Legislature authorized the Attorney General to promulgate regulations deemed necessary for the "interpretation, implementation, administration and enforcement" of the act. G. L. c. 140, § 32S.  As the statute made clear, the authority given to the Attorney General supplements the Attorney General's preexisting authority to regulate manufactured housing communities pursuant to the Consumer Protection Act.  See c. 140, § 32S; G. L. c. 93A, §§ 2, 9; 940 Code Mass. Regs. § 3.17 (1993) (regulating the landlord-tenant relationship).  To fulfill the statutory directive, the Attorney General

promulgated Title 940 Code Mass. Regs. §§ 10.00 (1996).  In
these regulations, the Attorney General established detailed
requirements concerning the respective rights and duties of park
residents and operators.[21]

3.  General Laws c. 93A, § 9, claims.  a.  Park operator's
removal and replacement duties.  The Attorney General's
regulations directly address the factual situation presented by
this case.  If an oil tank leaks, as it did here, the cost of
removing and replacing it belongs to the park operator unless
the negligence of the resident caused "the environmental
concerns or risks."  940 Code Mass. Regs. § 10.03(2)(n)
(§ 10.03[2][n]).[22]  No other exception to the park operator's

---

[21] For a more detailed discussion of the history and
provisions of the act, the State sanitary code, and regulations
and law guides promulgated by various Massachusetts Attorneys
General, see Craw vs. Hometown America, LLC, U.S. Dist. Ct., No.
18-12149 (D. Mass. Mar. 21, 2019) (denying motion to dismiss
park residents' class action complaint charging defendants with
unlawfully refusing to make necessary repairs to homesite
infrastructure).

[22] Title 940 Code Mass. Regs. § 10.03(2) provides in
pertinent part:

"It shall be an unfair or deceptive act or practice in
violation of M.G.L. c. 93A for an operator:

. . .

"(n) to require any resident to pay for the removal or
replacement of oil storage tanks on a home site to meet
environmental concerns or risks not caused by the
negligence of the resident, provided that the operator may

liability is provided.  As the Attorney General has explained, the regulation requires park operators to incur these costs initially because they are "usually better able to pay for or finance these costs upfront."  Attorney General's Guide to Manufactured Housing Community Law § II.D.8.h (March 2009) (Attorney General's Guide).[23]  Any operator who improperly transfers to the resident the financial responsibility for replacement costs commits an unfair or deceptive act or practice

---

recover such costs as capital improvements in accordance with 940 CMR 10.03(2)(l)."

[23] This provision in the 2009 Attorney General's Guide concerning "oil storage tanks" remained unchanged in the 2015 version of the Guide.  Section II.D.8.h of the 2009 Attorney General's Guide states:

"Oil storage tanks.  In recent years, community owner/operators have become concerned about their potential legal liability stemming from the environmental risks posed by leaking underground oil storage tanks.  The [Attorney General] Regulations require that the cost of removing or replacing an oil storage tank should be initially incurred by the community owner/operator, who is usually better able to pay for or finance these costs upfront.  Thus, you [the resident] may not be charged directly for the removal or replacement of oil storage tanks, but your community owner/operator may eventually recover such costs as capital improvements, in the manner allowed by law.  940 C.M.R. 10.03(2)(n).  This general rule applies whether the tank is above or below-ground.  There is one exception to the general rule:  where your [the resident's] negligence has caused the environmental concern or risk posed by the oil tank, you may be held directly responsible for removing or replacing it."

in violation of G. L. c. 93A, § 2 (a).  See § 10.03(2)(n).  This clear and unambiguous language controls our decision here.

The defendants, relying on the regulations "read in their entirety" and the provisions governing fuel charges for individually metered heating fuel sources and operator maintenance duties, see 940 Code Mass. Regs. §§ 10.05(4)(b)(3) and 10.05(4)(d), urge this court to carve out another exception to liability for privately-owned, individually-metered tanks. We decline to do so.  Clearly, it would be inappropriate to make a substantive change to the interpretation of a specific regulation by using language that the Attorney General did not see fit to include or even reference.  See Thurdin v. SEI Boston, LLC, 452 Mass. 436, 444 (2008) ("where there is an express exception in a statute, it comprises the only limit on the operation of the statute and no others will be implied"). Moreover, we are not inclined to adopt a judicial gloss that not only conflicts with the Attorney General's Guide, but also contravenes the purpose of the act to allocate reasonably the burden of addressing relevant safety and environmental concerns, as well as to assist a vulnerable class "deserving of legal protection."  Greenfield Country Estates Tenants Ass'n, 423 Mass. at 83.

On the undisputed facts here, the Layeses were entitled to summary judgment on this aspect of their c. 93A claims.

Following the failure of their tank, RHP Properties attempted to require them to fund the cost of a replacement tank until the defendants were ordered to provide one by the trial court.[24] This unfair or deceptive act did not stand alone. The defendants also had inserted in their standard lease agreement a provision placing an unconditional replacement duty on all of the residents, including the Layeses; in addition, the CC park rule to the same effect was posted only in the management office, far from scrutiny by the Attorney General. Moreover, both the lease provision and the CC park rule were inconsistent with § 10.03(2)(n) and the Attorney General's Guide. For these reasons, as a matter of law, the CC park rule placing the replacement burden on the residents in all cases was "unreasonable, unfair or unconscionable."[25] G. L. c. 140, § 32L (1). See § 32L (1) (prohibiting promulgation of such rules). The defendants' actions violated the act and the

---

[24] In the trial court, the defendants invoked the negligence exception to liability primarily on the basis that the Layeses admittedly did no maintenance work on their tank. As explained infra, it was the defendants who had the duty to maintain the tank.

[25] Although the act does not define the word "rule," the Attorney General's regulations broadly define the word to mean "any written or unwritten rule, regulation, or policy imposed by an operator that governs procedures, conduct, or standards within the manufactured housing community . . . ." 940 Code Mass. Regs. § 10.01.

Attorney General's regulations, and constituted additional unfair and deceptive acts or practices within the meaning of c. 93A, § 2 (a).[26]  See G. L. c. 140, § 32L (7); 940 Code Mass. Regs. § 10.02(2), (3); Clark v. Leisure Woods Estates, Inc., 89 Mass. App. Ct. 87, 94 (2016).

b.  Park operator's maintenance duties.  We turn to the legal question of more wide-reaching significance.  The Layeses claim that the defendants violated the Attorney General's regulations and c. 93A by placing the burden of maintaining the exterior components of the oil systems on the Layeses and all the CC park residents.  The defendants argue that, even if they can be held liable to the Layeses under c. 93A in the limited factual circumstances of this case, the defendants have no general duty under the Attorney General's regulations to "inspect, repair, service, and maintain" the residents' oil tanks.  The judge read the regulations to place the maintenance burden on the defendants.  We agree.

The park operator's duties with respect to basic utilities are set forth in 940 Code Mass. Regs. § 10.05(4) (§ 10.05[4]).  A park operator is required to make "basic utilities" available

---

[26] The defendants did not challenge the Layeses' satisfaction of the other elements of their individual G. L. c. 93A, § 9, claims.

to each site.[27]  See § 10.05(4)(a),(b).  Basic utilities are defined in the regulations as the "utility services listed in . . . [§] 10.05(4)."  940 Code Mass. Regs. § 10.01.  Five essential utilities are listed therein:  electrical service of appropriate amperage, a natural gas connection if "economically reasonable," a sufficient supply of potable water, a sanitary sewage disposal system, and "electricity, natural gas, or other heating fuel" (i.e., a source of heat).  § 10.05(4)(b)(1)-(3).  The regulations specify that the operator must not only "supply," but also "pay for" the water and the sewage disposal system.  See § 10.05(4)(b)(1), (2).  The operator must also "supply and pay for" the resident's heat unless the energy supply is separately metered to the individual home and the resident agrees to pay for the heat in the occupancy agreement.[28]

---

[27] Pursuant to § 10.05(4)(f), any operator who intentionally interrupts utility service furnished under § 10.05(4)(a) or (b) is subject to liability under G. L. c. 186, § 14.  See also the Attorney General's regulations governing landlord-tenant relationships, e.g., 940 Code Mass. Regs. § 3.17(6)(f) (1993) (making it an unfair and deceptive practice to willfully violate any provision of c. 186, § 14).  Compare 940 Code Mass. Regs. § 3.17(6)(g)(1) (1993) (making it unfair and deceptive practice for owner obligated by law to provide gas or electric service to resident to fail to provide it).

[28] This rule permitting park operators to shift heating costs to their residents is consistent with the State sanitary code.  See 105 Code Mass. Regs. § 410.354(A) (2005) (metering of electricity and gas); § 410.355 (oil); Young v. Patukonis, 24 Mass. App. Ct. 907, 908-909 (1987).

See §§ 10.05(4)(b)(3) and 10.05(4)(e) (permitting use charges for utilities determined by metering). The regulations permit the park operator to recover its expenses in providing these basic utility services through nondiscriminatory rent increases. See § 10.05(4)(c).

The duty to maintain the park utilities is specifically governed by § 10.05(4)(d),[29] which requires operators to install all basic utilities "to the point of connection at each manufactured home and [to] maintain[ them] in good repair and operating condition . . . without charge to residents . . . ." Home heating fuel falls within the definition of basic utility.

The defendants, reading §§ 10.05(4)(b)(3) and 10.05(4)(d) together, argue that where, as here, they properly transferred the duty "to supply and pay for" the heating oil to the Layeses, all the defendants' other regulatory duties with respect to the

---

[29] Title 940 Code Mass. Regs. § 10.05(4)(d) provides in full:

> "The basic utilities described in 940 CMR 10.05(4)(a) and (b), as applicable, shall be installed to the point of connection at each manufactured home and maintained in good repair and operating condition by the operator without charge to residents, except as damage thereto is caused by the negligent act or omission or willful misconduct of a resident. All such installation and maintenance shall be in accordance with applicable laws, codes, and professional standards" (emphasis added).

The language of this regulation is similar to language found in the State sanitary code. See 105 Code Mass. Regs. § 410.190 (2005) (hot water); § 410.200 (2005) (heating facilities).

oil tanks -- including the duty to replace leaking tanks -- were eliminated. We are not persuaded. The text of § 10.05(4)(d) permits the park operator to pass on the cost of maintenance and repair if the resident, through negligence or willful misconduct, causes damage to the utility components. As in § 10.03(2)(n), no other exception is provided. If the Attorney General wanted to relieve operators from their other duties in this situation, she would have expressly included appropriate language in the regulations. See Thurdin, 452 Mass. at 444.

The phrase "as applicable" in § 10.05(4)(d) does not support the defendants' argument that they have no duties at all with regard to individually-metered utilities. We read the phrase "as applicable," which modifies both § 10.05(4)(a) and (b) (i.e., all basic utilities), simply to limit the park operator's duties to the basic utilities actually in use in the park. If, for example, park residents heat with oil, no purpose would be served by requiring a park operator to install and to maintain gas lines and other unnecessary equipment.

Nor can the plain meaning of the regulations be overcome by the defendants' policy arguments. Many retired and disabled park residents are not in a position, physically or financially, to inspect regularly and maintain their oil tanks (or to hire professionals to do so). For individuals struggling to pay for their basic living expenses, oil tank maintenance and

replacement is beyond their means. In fact, an RHP Properties manager acknowledged that some park residents will "overlook" these duties, especially the seniors.

In addition, as landowners, the defendants acknowledge that they are potentially responsible persons for any releases of hazardous materials at Chelmsford Commons. See G. L. c. 21E, § 5. Pollution to the environment caused by leaking oil tanks is not in anyone's interest, and remediation work, as the defendants have put it, can be "catastrophically expensive." In light of that potential "traumatic" liability, the wisdom of a corporate policy imposing oil tank maintenance (and replacement) duties on residents living on fixed incomes is certainly one that the Attorney General had cause to question.

Furthermore, the Attorney General reasonably could conclude that the defendants are in at least as good, if not better, position than the residents to perform these tasks. The defendants' employees already monitor the condition of all the oil tanks in the CC park four times per year, checking for anything posing environmental concerns.[30] Records of each inspection are kept in the park office. These records can serve as a valuable reference guide in gauging when tank maintenance

---

[30] Routine inspections performed by the defendants' employees involve making observations of the tanks (which generally leak from their bottoms), looking under the homes for signs of leaks, and checking the site for the odor of fuel oil.

and replacement should be scheduled.  As the Attorney General's Guidelines point out, park operators and management companies also are better positioned to keep up with new laws and industry practices relating to utility systems.  See, e.g., note 15, supra.  Finally, any harshness in what the defendants term an "oppressively burdensome" rule is softened by the defendants' ability to recoup, through community-wide, nondiscriminatory rent increases, the expenses incurred in maintaining the utility systems and in replacing oil storage tanks due to environmental concerns or risks.[31]  See, e.g., 940 Code Mass. Regs. §§ 10.03(2)(l), (n); 10.05(4)(c).

Where a sensible construction of a regulation is available, we will not adopt an interpretation that leads to an illogical result.  See New England Power Generators Ass'n v. Department of Envtl. Protection, 480 Mass. 398, 411 (2018).  With respect to other basic utilities, the defendants acknowledge that, under their interpretation of the regulations, residents with individually-metered electricity and natural gas would be responsible for maintaining the exterior components of those utility systems leading up to their homes.  Components required

---

[31] The defendants' concern for the rights of the residents posed by routine site inspections was not raised below, and we do not consider it further.  See 940 Code. Mass. Regs. § 10.03(8)(b).

to provide electricity and gas service would include wires, transformers, and underground pipes.[32]  This result cannot be what the Attorney General intended.

In sum, we see no error in the judge's interpretation placing the duty to maintain, repair, and replace the exterior components of oil heating systems upon the defendants.  The only exceptions to this rule are those involving resident negligence or misconduct.  Residents who cause the "environmental concerns or risks" are responsible to pay for removing and replacing compromised oil tanks.  § 10.03(2)(n).  Residents who damage the basic utilities in the park are responsible for the costs of repair.  However, the operator cannot justify asking a resident to pay for a replacement tank on the ground that the resident was negligent in failing to perform routine maintenance on the tank, which in fact is the park operator's responsibility under

---

[32] We note that, even where the landlord is not required to pay for electricity and gas used in a dwelling unit, the State sanitary code still places the duty on the landlord to install and maintain the wiring and pipes.  See 105 Code Mass. Regs. § 410.354(C) (2005).  As the sanitary code has the same objectives and covers the same subject matter, its provisions should be read in pari materia with the Attorney General's regulations.  See Commonwealth v. J.A., 478 Mass. 385, 387 (2017) (in interpreting statutes, courts may find other statutes covering same subject instructive).  See also Molly A. v. Commissioner of the Dep't of Mental Retardation, 69 Mass. App. Ct. 267, 281 (2007).

the regulations.  Thus, summary judgment was properly entered on this aspect of the Layeses' individual c. 93A claims.

4.  General Laws c. 186, § 14, claims.  In defending the class action ruling, the defendants argue that Rosa cannot prove her quiet enjoyment claim individually and that she failed to establish a violation of G. L. c. 186, § 14 (§ 14).[33]  We disagree.  Liability already was established under § 14 as part of the final judgment.  (See note 18, supra.)  However, the judge did not state the ground or grounds upon which he predicated that liability.

---

[33] General Laws c. 186, § 14, provides, in relevant part:

"Any lessor or landlord of any building or part thereof occupied for dwelling purposes . . . including a manufactured home or land therefor, who is required by law . . . to furnish water, hot water, heat, light, power, [or] gas . . . to any occupant of such building or part thereof, who willfully or intentionally fails to furnish such water, hot water, heat, light, power, [or] gas . . . at any time when the same is necessary to the proper or customary use of such building or part thereof . . . or who transfers the responsibility for payment for any utility services to the occupant without his knowledge or consent, or any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant . . . shall be punished by a fine of not less than twenty-five dollars nor more than three hundred dollars, or by imprisonment for not more than six months.  Any person who commits any act in violation of this section shall also be liable for actual and consequential damages or three month's rent, whichever is greater, and the costs of the action, including a reasonable attorney's fee . . . ."

The Layeses proceeded under three of the five prongs of § 14. They alleged that the defendants' "refusal to assume responsibility for the maintenance, repair and replacement of the home heating oil system external components" constituted the (1) willful and intentional failure to furnish utility services required by law; (2) interference with their quiet enjoyment of their premises; and (3) transfer of the duty to pay for utility services without their consent. See § 14; note 33, supra. We conclude that the Layeses were entitled to judgment as matter of law under all three theories of liability. The undisputed facts establish that the defendants refused to replace the Layeses' oil tank as required by § 10.03(2)(n). In addition, as the second heating season without a permanent oil tank approached, the defendants removed the temporary tank and the fuel lines from the home site, leaving the family with no means to get home heating oil inside to their furnace. This conduct amounted to the "willful[] . . . interrupt[ion of] . . . utility service[s]" for purposes of § 14 liability. See 940 Code Mass. Regs. § 10.05(4)(f).

Liability also could properly have been imposed under the second prong of § 14 asserted by the Layeses. The term "quiet enjoyment" at common law signified the tenants' rights to be free from "serious interferences" with their tenancies. Simon v. Solomon, 385 Mass. 91, 102 (1982). Serious interferences

means "acts or omissions that impair the character and value of the leased premises" (quotation and citations omitted). Id. Section 14 codified these common-law rights.[34] See Al-Ziab v. Mourgis, 424 Mass. 847, 850 (1997). We note that, even where a landlord has not intended to violate a tenant's rights, the landlord may be held responsible for breaches of the covenant of quiet enjoyment that "flowed as the natural and probable consequence of what the landlord did, what he failed to do, or what he permitted to be done." Blackett v. Olanoff, 371 Mass. 714, 716 (1977).

Here, the defendants failed to provide the Layeses with the means to heat their home centrally during the winter. As a result of the lack of adequate heating facilities, the conditions inside the home made it uninhabitable in the early morning hours.[35] See 105 Code Mass. Regs. § 410.201 (2005) (establishing minimum temperature requirement of at least sixty-

---

[34] The Supreme Judicial Court has observed that § 14 "belongs to a body of statutes establishing tenants' remedies against landlords who fail to provide safe and sanitary housing." Simon, 385 Mass. at 100.

[35] As the defendants point out, the Layeses did have three other potential sources of heat in their home: a propane fireplace insert, a wood-burning stove, and a kerosene heater. These sources, however, were unable to provide adequate heat through the night. We also note that for safety reasons, a kerosene heater may not be used to satisfy the State sanitary code requirement that the owner provide heating "facilities." See 105 Code Mass. Regs. § 410.200(A), (B) (2005).

four degrees between 11:00 <u>P.M</u>. and 7:00 <u>A.M</u>.). Heat is an essential service that "go[es] to the essence of what the landlord is to provide." <u>Charles E. Burt, Inc</u>. v. <u>Seven Grand Corp</u>., 340 Mass. 124, 127 (1959). Few things would more seriously impair the character and value of leased premises than lack of heat. See 105 Code Mass. Regs. § 410.200(A) (2005) (heating facilities required); <u>Abdeljaber</u> v. <u>Gaddoura</u>, 60 Mass. App. Ct. 294, 301 (2004) (affirming award of three months' rent under c. 186 based on failure to provide tenants with adequate heat); <u>Lowery</u> v. <u>Robinson</u>, 13 Mass. App. Ct. 982, 982-983 (1982) (landlord's failure to provide heat during heating season qualified as serious impairment warranting c. 186 liability).

Moreover, we conclude that the judge properly could have found for the Layeses on their third theory -- that the defendants violated the statutory bar against transferring their duty to pay for utility services. Under the Attorney General's regulations, the park operator is required to provide basic utility services to the residents. The operator is required to maintain the utilities in good repair and operating condition at no expense to the residents up to the point of connection to the home. § 10.05(4)(d). The undisputed facts here established that, through their standard lease, the defendants transferred their duties and costs to the Layeses.

We reject the defendants' argument that the Layeses' claim does not fit within the plain language of § 14. The duty to provide "utility services," see 940 Code Mass. Regs. §§ 10.01, 10.05(4), encompasses the duty to maintain and to replace the components required to deliver those services. The defendants argue that the residents, through their leases, agreed to assume the maintenance and replacement duties and costs. This argument fails. As matter of law, the residents could not consent to a lease provision transferring the defendants' regulatory duties to them. See 940 Code Mass. Regs. § 10.03(9)(b) (declaring any lease provision "which releases or limits the operator's liability arising under law . . . void and unenforceable"); Trustees of the Cambridge Point Condominium Trust v. Cambridge Point, LLC, 478 Mass. 697, 705 (2018) (recognizing that some contracts are void as against public policy and will not be enforced); Berman & Sons v. Jefferson, 379 Mass. 196, 199 n.6 (1979) (finding exculpatory clause in lease "of no effect"); Boston Hous. Auth. v. Hemingway, 363 Mass. 184, 199 (1973) (holding that landlord's implied warranty of habitability cannot be waived by any lease provision). Thus, notwithstanding the lease provision, the transfer of responsibility for the services occurred without the residents' consent. The Layeses were entitled to judgment as matter of law under this prong of § 14 as well.

Finally, the defendants argue that their conduct did not rise to the level of a "serious interference[]," Simon, 385 Mass. at 102, with the Layeses' tenancy. We disagree. Even assuming, without deciding, that a serious or substantial interference was a required element of an unlawful transfer claim, the Layeses made that showing here. The defendants implemented a policy that deprived the Layeses and other residents of necessary utility services to which they were entitled. Moreover, despite complaints from residents and a warning from the Attorney General, the defendants failed to assume the duties required of them by the regulations. See Al-Ziab, 424 Mass. at 850 (noting that conduct involving some degree of fault is required to impose liability on landlord under § 14). As a result, the Layeses were entitled to an award of three months' rent, an amount that was greater than their actual and consequential damages.[36]

B. Class certification. 1. Procedural facts. In Rosa's amended class action complaint, she sought the certification of a class of 240 current and former Chelmsford Commons residents who resided at the park at any time since April 22, 2011, and

---

[36] Where, as here, the tenants remained in possession during the breach, "actual damages 'are measured by the difference between the value of what the lessee should have received and the value of what he did receive.'" Curtis v. Surrette, 49 Mass. App. Ct. 99, 104 (2000), quoting Darmetko v. Boston Hous. Auth., 378 Mass. 758, 761 n.4 (1979).

who heated their homes through oil-fueled systems.  Her amended class action complaint looked much like the Layeses' original complaint.  In it, she alleged that, since taking ownership in 2011, the defendants had implemented an illegal policy affecting all members of the class, requiring the residents to maintain, repair, and replace the exterior components of their home heating oil systems.  She further alleged that the defendants' policy violated the act, the Attorney General's regulations, and c. 93A, and that the transfer of the above-listed responsibilities to the residents constituted a transfer of the responsibility to pay for utility services to the residents without their consent, in violation of c. 186, § 14.[37]  She asserted claims under c. 93A and c. 186 on behalf of herself and all members of the class, and sought permanent injunctive relief and compensatory damages for injuries arising from the defendants' refusal to carry out their regulatory obligations.[38]  Specifically, she sought certification of a consumer class under G. L. c. 93A, § 9 (2);[39] and certification of both the cc. 93A

---

[37] Other theories of liability have been waived.

[38] As part of the final judgment entered in connection with their successful individual claims, the Layeses obtained the prospective, permanent injunctive relief they sought on behalf of the class members still in residence at the CC park.

and 186 claims under Mass. R. Civ. P. 23, as amended, 471 Mass. 1491 (2015).[40]

By the time the motion judge took up the motion for class certification, another judge had already found that the Layeses were entitled to judgment as matter of law on their individual c. 93A claims.  However, the motion judge denied Rosa's motion

---

[39] General Laws c. 93A, § 9 (2), governs the certification of a class action under the consumer protection law and provides in relevant part:

"Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons . . . ."

[40] Rule 23 of the Massachusetts Rules of Civil Procedure provides, in pertinent part:

"(a) Prerequisites to Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) Class Actions Maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

for class certification, concluding that she had failed to meet the requirements of both c. 93A, § 9 (2), and rule 23. Rosa appeals.

2. _Standard of review_. We review a ruling denying class certification for abuse of discretion. See Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 361 (2008). An abuse of discretion may be found if the motion judge relies on improper factors, engages in action that is "arbitrary, unreasonable, or capricious," or commits legal error (citation omitted). Id. On a motion under either rule 23 or c. 93A, § 9 (2), plaintiffs must provide "information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of rule 23 [and c. 93A, § 9 (2)]; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met" (emphasis added; citation omitted). Kwaak v. Pfizer, Inc., 71 Mass. App. Ct. 293, 297 (2008).

The certification requirements of c. 93A, § 9 (2), and rule 23 are not coextensive. See Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass. 67, 72 n.11 (2016). The statutory class certification standard has a more "mandatory tone" than the rule. Kwaak, 71 Mass. App. Ct. at 298. In exercising discretion with respect to a c. 93A certification request, the public policy of Massachusetts strongly favoring c. 93A class actions should be considered. See Bellermann, 475 Mass. at 71.

Moreover, the judge should "bear in mind that our consumer protection statute was designed to meet a pressing need for an effective private remedy for consumers" (quotation and citation omitted).  Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 605 (1985).  In sum, the requirements of § 9 (2) are "easier to satisfy" than those of rule 23 (citation omitted).  Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 10 (2019).

3.  General Laws c. 93A, § 9 (2), certification request.  A plaintiff will prevail on her motion for certification under c. 93A upon showings that (1) she was "entitled to seek relief under c. 93A for . . . injuries resulting from the defendant[s' alleged] unfair or deceptive act or practice"; (2) the "assertedly unfair or deceptive act or practice that caused [her] injuries 'caused similar injury to numerous other persons similarly situated'"; and that (3) the plaintiff "would 'adequately and fairly represent[] such other persons.'"  Bellermann, 475 Mass. at 72, quoting G. L. c. 93A, § 9 (2).

Here, the motion judge, adopting the earlier summary judgment interpretation of the Attorney General's regulations, ruled that the defendants were responsible for maintaining, removing, and replacing the oil tanks.  However, she concluded that, while the defendants were "subject to liability under G. L. c. 93A if they require residents to pay for the removal or replacement" of their tanks, the defendants would not be liable

to CC park residents as to whom the defendants took no affirmative action with respect to their tanks. To reach that conclusion, she reasoned that in order to commit an unfair or deceptive act or practice under c. 93A, an operator had to "impose" or "enforce" a rule or "otherwise take action" that conflicts with the act, the Attorney General's regulations, or other applicable law. See 940 Code Mass. Regs. §§ 10.02(2), (3); 10.04(1)(a)(4).

Applying this reasoning to the information submitted by Rosa, the judge found that, to the extent that the class action claim arose out of the "enforcement" of the lease provision, Rosa provided evidence that the defendants had enforced it against only eighteen households. A putative class of this few in number, in the judge's view, failed to satisfy "the numerosity requirement of G. L. c. 93A, § 9 (2)."

Next, the judge ruled that, absent some affirmative act, the mere existence of the lease provision did not amount to the "imposition" of a rule that violated 940 Code Mass. Regs. §§ 10.03(2)(n), 10.05(4)(d); and c. 93A. Finally, the judge questioned whether the "similar injury" requirement could be met on a class-wide basis.

The judge's class certification analysis was flawed, and as a result, remand is required to properly consider the class certification calculus. To begin, the proposed class is

sufficiently numerous. The plaintiff has defined the class as those current and former CC park residents, during a defined time period, who heated their homes "with a home heating oil system." This class definition was appropriately definite. The class members could be ascertained by objective criteria, and it is not contested that there were 240 such park residents. It is the plaintiff's role to define the proposed class in the first instance, and where the proposed class is sufficiently definite, the judge ordinarily should not redefine it for numerosity purposes.

The recent decision of the Supreme Judicial Court in Gammella, 482 Mass. 1, is instructive in this regard, as in that case the court reversed a trial court's decision denying class certification based upon a perceived lack of numerosity. The court noted, among other things, that uncertainties about the particular facts of individual class members should not lead to denying class certification on numerosity grounds, "at least when hundreds of [proposed class members] are affected by an apparent prohibited 'class-wide practice.'" Id. at 13. Here, a class of 240 members is sufficiently numerous to qualify for class treatment.

Once the class has been defined and is sufficiently numerous, however, the next question, for a c. 93A class, is whether the purported class members suffered "similar injury"

from the unfair or deceptive practice.  See c. 93A, § 9 (2).
This is the issue that appeared to cause the motion judge the
most concern, because the evidence indicated that the unlawful
lease provision was actively enforced against only eighteen of
the 240 purported class members.

The judge's concern about whether the injuries were
sufficiently "similar" was a valid concern.  Nevertheless, we
believe there are countervailing considerations that may justify
the certification of a class under the circumstances.  Each
member of the proposed class here was required to sign a lease
containing a clause that violated c. 93A.  The question of the
legality of the lease clause was an important and common issue
to all proposed class members.  Based upon our decision today,
each purported class member was at least entitled to injunctive
relief against enforcement of the clause.  In adjudicating the
class members' c. 93A claims, however, the judge must address
whether each purported class member is also entitled to some
amount of monetary relief.  To be so entitled, a class member
would need to show additional elements -- "injury" caused by the
c. 93A violation, as well as the amount of any damages.  See
c. 93A, § 9 (1), (3).

Accordingly, as to the c. 93A class, one issue for the
judge on remand is whether there are sufficiently similar
injuries across the purported class.  To prove a c. 93A claim

and the entitlement to at least statutory damages, a plaintiff must show not only the c. 93A violation, but also some kind of "separate, identifiable harm" resulting from the c. 93A violation. Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). Put another way, the mere fact that the offending clause existed in a resident's lease is not sufficient to establish a c. 93A injury; each CC park resident must show actual harm caused by the clause. See Tyler, supra. On the current record, it appears that many class members suffered some injury, although the nature and cause of the injury may have varied. For example, a CC park resident may have been injured due to enforcement of the clause against him (as in the Layeses' case, where the family suffered inordinately cold indoor temperatures during the winter months, cf. id. at 504 & n.20), or the park resident may have incurred the costs of maintenance or other costs that resulted because the defendants had failed to maintain a fuel tank properly.[41],[42] On the other hand, it is

---

[41] We do not mean this list to be exhaustive. Purported class members may have additional theories for how they were injured as a result of the lease clause.

[42] We do not agree with the motion judge's ruling that there could be no c. 93A violation as to a particular CC park resident unless the operator committed some additional "affirmative action" that amounted to "imposition" of the lease clause on that park resident. The placement of the clause in the lease documents was a c. 93A violation; no further "affirmative action" was required. See §§ 10.03(2)(n) and 10.05(4)(d).

also possible that some proposed class members may not have suffered any harm as a result of the defendants' policies regarding residents' exterior fuel tanks.

Accordingly, on remand the parties and the motion judge must address the claimed injuries (if any) of the purported class members; how the injuries are similar or different; and how they might be proved.  In determining whether a class should be certified, the judge should keep in mind the principles, identified above, favoring c. 93A classes where circumstances warrant.  Here, the c. 93A violation is common to the class.  The fact that injury or damages may vary across the class is not necessarily a bar to class certification.  Courts frequently have held that a class can be certified despite differences in damages among class members.  See Salvas, 452 Mass. at 364 ("Class certification may be appropriate where common issues of law and fact are shown to form the nucleus of a liability claim, even though the appropriateness of class action treatment in the

_____

Moreover, the judge's analysis incorrectly restricted the scope of the protection afforded under the law.  Not only can an operator commit a violation of G. L. c. 93A, § 2 (a), by affirmative acts, it can also do so by inaction (i.e., failing to comply with provisions of either the act or the Attorney General's regulations).  See 940 Code Mass. Regs. § 10.02(3); Clark, 89 Mass. App. Ct. at 94.  Nevertheless, in order to recover under c. 93A, each purported class member must show not only a violation of c. 93A, § 2, but also a "separate, . . . distinct injury or harm."  Tyler, 464 Mass. at 503.

damages phase is an open question").  The question for the

motion judge is whether the injury issue can be resolved for

each class member in a way that is manageable and reasonably

efficient, and fair to both plaintiffs and defendants.[43]  See

Fletcher, 394 Mass. at 605-607 (judge has discretion in applying

similarity requirements of c. 93A, § 9 [2], and in evaluating

suitability of proposed class).[44]  Here, the record suggests that

the question of injury as to individual class members could

present sufficient similarities so as to allow for such a fair

and manageable resolution, which is a matter the motion judge

can take up on remand.

    4.  General Laws c. 186, § 14, certification request.

Finally, Rosa also asserts that a class should have been

_____

    [43] Although the defendants point out that they have a
defense if injury was caused by the plaintiffs' own negligence,
that is not a basis for denying class certification here.  There
was no evidence on this record suggesting that any resident had
negligently caused an "environmental concern[] or risk[]," or
had damaged any utility components through negligence or
misconduct.  See §§ 10.03(2)(n), 10.05(4)(d).  The fact that the
Attorney General's regulations may theoretically provide
defenses to the defendants' liability as to hypothetical class
members is not a basis for denying class certification.  See
Salvas, 452 Mass. at 367.

    [44] Although the requirements of "predominance" and
"superiority," which are found in rule 23 (b), do not appear as
express requirements in c. 93A, § 9 (2), "a judge retains some
discretion to consider these factors in determining whether
putative class members are 'similarly situated' and have
suffered a 'similar injury'" (citations omitted).  Bellerman v.
Fitchburg Gas & Elec. Light Co., 470 Mass. 43, 53 (2014).

certified on the § 14 claim.[45]  This contention is governed by
Mass. R. Civ. P. 23, and presents different issues from those
arising under c. 93A.  For example, proof of liability involves
different elements under c. 186, § 14, and c. 93A.  See Cruz
Mgt. Co. v. Thomas, 417 Mass. 782, 789 (1994) (claim under
c. 186, § 14, can be predicated on negligence); G. L. c. 186,
§ 14 (landlord who, inter alia, "transfers the responsibility
for payment for any utility services to the occupant without his
knowledge or consent . . . shall be liable . . .").  Compare 940
Code Mass. Regs. § 3.17(6)(f) (1993) (unfair and deceptive
practice for owner to "violate willfully any provisions of
[G. L.] c. 186, § 14"); G. L. c. 93A, § 9 (1) ("Any person . . .
who has been injured by . . . any method, act or practice
declared to be unlawful by [c. 93A, § 2,] . . . may bring an
action . . .").  Moreover, if liability is found, damages under
c. 186, § 14, may be more readily established than under c. 93A.
See, e.g., Clark, 89 Mass. App. Ct. at 91, quoting Darmetko v.
Boston Hous. Auth., 378 Mass. 758, 762 (1979) (G. L. c. 186,
§ 14, "allows a minimum recovery of three months' rent as an
incentive to the pursuit of relief where the actual and

---

[45] As we have noted, on appeal, Rosa pursues only her theory that the defendants violated § 14's proscription against "transfer[ring] the responsibility for payment for any utility services to the occupant[s] without [their] knowledge or consent."  See note 37, supra, and accompanying text.

consequential damages are slight or are difficult to prove").

Compare G. L. c. 93A, § 9 (providing for "actual damages or

twenty-five dollars, whichever is greater" for injury resulting

from violation that was not willful or knowing).  Because the

motion judge did not address certification of the claim under

c. 186, § 14, remand is required for this reason as well.

Conclusion.  So much of the judgment as denied class

certification is vacated, and the question of class

certification is remanded for further proceedings consistent

with this opinion.  In all other respects, the judgment is

affirmed.

So ordered.